Cali P. Madia, Esq.
Daniel S.  Szalkiewicz, Esq.
VERIDIAN LEGAL P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEVEN SANON and SIMRAN HOTCHANDANI, | **COMPLAINT** |
| Plaintiffs, | |
| v. | Case Action No. 26-cv- 580 |
| SRIJANI CHATTERJEE, JOHN DOES 1-10, and JANE DOES 1-10, | |
| Defendants. | |

Plaintiffs Deven Sanon ("Deven") and Simran Hotchandani ("Simran" and, together with Deven, "Plaintiffs"), by their attorneys VERIDIAN LEGAL P.C., as and for their Complaint hereby allege, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      Following a contentious marriage and divorce, defendant Srijani Chatterjee ("Chatterjee" or "Defendant") initiated a complex and anonymous online harassment campaign against her former in-laws which, unfortunately, has included Plaintiffs, who are Chatterjee's former brother-in-law and sister-in-law: individuals she has met only a handful of times.

2.      Chatterjee's harassment has been as widespread as it is false.  She has created or caused the creation of countless articles, websites, social media posts, and online petitions calling

Simran a "transgender[1]" woman who, among other things, is part of a criminal family who commits "tax and customs fraud[2]" and who further defrauded the Canadian government by "illegally misrepresent[ing][3]" her Canadian residency to obtain more favorable tuition rates.

3.      Chatterjee's harassment of her ex-husband's brother has taken on a similar theme, with Chatterjee claiming Deven is engaged in a "sham marriage[4]" or "planned immigration marriage[5]" with Simran "in exchange for the bribe of the Hotchandani family's black money.[6]" Other falsities include that Deven "commits perverse criminal act[s] of voyeurism[,][7]" "took his twin's phone, hacked into the device, and violated the private chat and media exchanged between Ronick Sanon and his wife… [which] primarily consisted of sexually intimate and vulnerable communications" which he then "lecherously t[ook] photos of…and transferr[ed]" to his "transgender partner" for their own "illegal kink-related pleasure.[8]"

4.      Chatterjee's articles further claim that Deven "is queer by sexual orientation[,] was involved with a "series of sexually deviant encounters of a perverted nature in his university[9]" and is one of two "central figures in a documented case of marital fraud, coercion, illegal eviction, and sustained abuse against a legal wife.[10]"

5.      Once the articles were published, Defendant then used them to attempt to interfere with Plaintiffs' lives and reputations, including by creating online petitions to revoke Simran's degree, sending her wholly fabricated articles about academic fraud to Simran's alma mater, and

---

[1] https://siliconvalleytime.com/article/a-wedding-for-the-price-of-a-divorce/, date of publication unknown
[2] https://thewashingtonmagazine.com/the-criminal-hotchandani-family-of-belize/, published June 21, 2024
[3] Id.
[4] Id.
[5] techbullion.com/a-wedding-bought-with-a-divorce-the-sanon-hotchandani-scandal/, published June 10, 2025
[6] https://thewashingtonmagazine.com/the-criminal-hotchandani-family-of-belize/, published June 21, 2024
[7] techbullion.com/voyeur-twin-deven-sanon-violates-in-law/, published March 22, 2025
[8] Id.
[9] Id.
[10] techbullion.com/a-wedding-bought-with-a-divorce-the-sanon-hotchandani-scandal/, published June 10, 2025

linking to the dozens of false and defamatory articles she created or caused to be created on more than one hundred local Indian Facebook groups throughout the country.

6.     Defendant, an attorney, was mindful to undertake this scheme anonymously due to the overwhelming possibility it would impact her divorce, law license, immigration standing, and/or financial interests.  As a result, Plaintiffs were forced to undertake pre-action discovery to identify the individual harassing them.

7.     Thankfully, pre-action discovery conclusively identified Chatterjee as the responsible party.  Further, Defendant appearing in the action and filing notifications she had received from Google LLC and Meta Platforms, Inc. confirmed Chatterjee's use and control over the accounts being used to harass Plaintiffs.

8.     Defendant has zero reason to believe any of the allegations contained in these articles, petitions, posts, e-mails, and other communications; in fact, she has concocted these claims using crumbs of fact – such as Simran's true alma mater – alongside distortions created wholly from her own malicious imagination.  Chatterjee's goal is not to spread truth; it is to devastate and inflict maximum damage on her former family in a deluded and hate-fueled retaliation campaign against her ex-husband and his perceived allies.

9.     Chatterjee's harassment has deeply impacted Plaintiffs, whose first years of marriage have been forever tainted by Defendant's relentless harassment.

10.     This action is not intended to chill, restrain, or burden constitutionally protected speech. Rather, it arises solely from Defendants' knowing publication and republication of false statements of fact, made with actual malice and/or reckless disregard for the truth, and causing concrete reputational and economic harm to Plaintiffs. Plaintiffs plead these claims with particularity and evidentiary grounding sufficient to defeat any anti-SLAPP motion or comparable

early-dismissal application. Plaintiffs allege facts demonstrating knowing falsity, malice, and resulting damages.

## JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

11.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

12.     Plaintiff Deven Sanon is domiciled in the Commonwealth of Massachusetts.

13.     Plaintiff Simran Hotchandani is a citizen of Belize and is domiciled in the Commonwealth of Massachusetts.

14.     Upon information and belief, Defendant is a citizen and domiciled in Brooklyn, New York. Complete diversity of citizenship existed at the time this action was commenced, which is the relevant jurisdictional inquiry under 28 U.S.C. § 1332.

**Personal Jurisdiction**

15.     This Court has personal jurisdiction over Defendant pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302(a), because Defendant knowingly and intentionally directed tortious conduct into New York, including the publication and dissemination of defamatory statements to recipients located in New York, causing reputational and other injury to Plaintiffs in New York, where the brunt of the harm was suffered.

16.     At the time Defendant began publishing and disseminating the defamatory statements alleged herein, including throughout 2024 and 2025, Plaintiffs were domiciled in and residing in New York.

17.     Defendant's conduct was purposefully directed at New York in that the statements at issue concerned Plaintiffs' New York-based activities, reputation, and professional standing, and Defendant knew or reasonably should have known that the foreseeable effects of her conduct would be felt in New York.

18.     To the extent any of Defendant's tortious conduct occurred outside the State of New York, Defendant committed tortious acts outside New York that caused injury within New York and reasonably should have expected such acts to have consequences in New York.

**Venue**

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the publication, republication, advertising, and dissemination of the defamatory statements and harassment alleged herein.

20.     Venue is also proper based on the fact Defendant Chatterjee resides at 214 Atlantic Avenue, 2B, Brooklyn, NY 11201.

21.     Upon information and belief, relevant witnesses and evidence, including records from online platforms, advertisers, registrars, and payment processors, are located in, or accessible from, this District, and Defendant's conduct has caused ongoing injury to Plaintiffs' reputations and professional opportunities within this District.

## FACTUAL ALLEGATIONS

**The Parties' and their Relationship**

22.     Plaintiff Deven works in biotechnology.  Deven first met Defendant Chatterjee shortly prior to his brother marrying her.  For a period of approximately one and a half years,

Defendant Chatterjee was Deven's sister-in-law.  During this time, Deven resided hundreds of miles away from his brother and Chatterjee and only met her in person a few times.

23.     When Defendant made the bulk of the statements about Plaintiff Simran, Simran was an employee at a corporation with a principal executive office address in New York, NY.  Simran was also a volunteer at Spread the Joy, a 501(c)(3) organization based out of the tri-state area.

24.     Plaintiff Simran had been dating Deven for a period of approximately four years when Chatterjee began dating Deven's brother, Ronick.  While the two women were dating and/or married to twin brothers, they lived hundreds of miles apart for the brief time they were connected by marriage.

25.     To the best of Simran's recollection, she has only met Chatterjee in person three times.  Chatterjee has never met or communicated with any member of Simran's immediate family.

26.     Defendant married Deven's brother, Ronick, in a private ceremony in July 2021.

27.     Upon information and belief, Ronick did not want his family to know that he had married Chatterjee, informing his twin brother only after the fact and requesting that the marriage be kept secret from the rest of the family.

**The Parties and their Families, Associates Begin Receiving Strange Messages**

28.     Shortly after Ronick and Chatterjee married and before he had disclosed this fact to the rest of his family, various members of Ronick's family began receiving text messages from unknown phone numbers posing as various government officials or real acquaintances who had apparently stumbled upon the marriage certificate and wanted to send Ronick's family members their best wishes on the marriage of Chatterjee and Ronick.

29.    Upon information and belief, these messages were not sent by government officials or acquaintances but rather by Chatterjee, who wanted Ronick's family to be made aware of their marriage.

30.    Ronick filed for divorce on December 20, 2022.  An affidavit of service was uploaded onto the divorce docket on December 30, 2022.

31.    Since then, Defendant has made it her life's goal to inflict misery on her ex-husband and every member of his family, including but not limited to his brother, sister, mother, father, grandfather, and even his brother's new in-laws.

**Chatterjee's Threats to Destroy Plaintiffs and their Families**

32.    Chatterjee has not been shy about her intent to destroy her ex-husband and his family, making various threats to do so via text messages from her known telephone number to her ex-husband during their divorce.

33.    Chatterjee's allusions to her plans and threats to harm include, but are not limited to, the following:

- "But come at her and just watch how I burn Deven, Simran the whore, and you to the ground."
- "Just wait till the articles, podcasts, what have you all learn of what exactly your fucked up mother and you did behind my back. Hope she finds some place to hide herself in her own America then. Ready yourselves for a storm.  For every smile you took, for every game you 'people' played, for every tear…you will pay."
- "Simran and Sana will get exactly what they deserve for everything they have done regardless of what I text them…"
- "Picking Simran was your worst mistake and trust that you will realise it in no time. Asha and Sanjay aren't shit, neither is that tranny."
- "Leave Lynn the fuck alone.  Be it you or your family.  Nothing will be accepted nor denied. Allow me to put this in writing.  I can confirm that there is no way of associating Lynn with that email address. Therefore, there is no proof that email address is hers. Whether she wrote anything or didn't is immaterial. I'll take responsibility for the words from that email address should they be used against her in any way. Come at me. But

come at her and just watch how I burn Deven, Simran the whore, and you to the ground. Text Lynn one more time."

- "No one is going to stop me from speaking the truth anymore because guess what psychopath…you calling me names and insulting me like your fucked up trailer trash upbringing taught you to do to women, won't change me speaking about everything that has happened here…Expect articles, books, fucking interviews…"

- "I'll fucking take you down how fucking dare you…Wait till all of New York City, then all of New York State, then all of the fucking US hears what you have done to me and how you have treated me…"

- "Fuck you, watch what I do to you now."

- "You do know that in finance in New York, all it takes is even one person hearing about how you duped a post nup? It takes one person to know your falsities and dupes and pretenses to lose all credibility…"

- "Sorry but do I strike her as her Brampton husband or her sister's mail order husband from India or her son's mail order bride from Belize or nana's green card wife from India? Who the fuck did she think she was dealing with her? I'm more educated, I'm smarter, I'm far more capable, I have a far better personality, far more people like me and enjoy my company, far more…"

- "Simran's sindhi contacts for wedding discounts in the Canary Islands aren't the only Sindhis in town over there. There are plenty who are far more powerful that I know."

- "Leave every group in an attempt to humiliate and degrade me Ronnie, but trust, now I will rip you apart. In every way for everything you, your mother, your father, your brother, his whore, and your ex or current whore have done to me. And even that could never be enough…"

- "That doesn't mean that I won't stand up for myself and give you a piece of my mind. As was the case with Simran and whoever the fuck else, now, nothing else but the blunt truth of my own feelings."

- "For everything you have put me through, for every way you have disrespected me, ruined my life…there will be an equal and opposite reaction…Mark my fucking words, Ronnie, you're done."

- "Attend that wedding and know, that's the last event you disrespect, degrade, and demean me with…that's all I'm waiting for, let that wedding occur, your attendance with other scum in attendance in absolute humiliation to me…will be all it takes for the cannons to then really go off…You deserve your ass set on fire. And that's exactly what will happen…"

- "The shit she has said to mine, the way she has hurt my mother, she will pay for…And you will pay for the rest."

**The Defamatory Statements Concerning Plaintiffs**

34.     Defendant has created or caused the creation of countless websites, "articles," petitions, advertisements, and posts about Plaintiffs.

35.     At all relevant times, Defendant knew or reasonably should have known that Plaintiffs were domiciled in and residing in New York.  Indeed, their location was frequently referenced in the defamatory content.

36.     With regard to the articles, Defendant has posted them or caused them to be posted on what can only be described as "fake news" websites or content farms.  These websites are not real journalistic organizations and are designed to attract traffic and search engine visibility.  While they are optimized to look useful and authoritative, the content which appears on these websites does not go through any editorial or fact checking processes.

37.     The goal of these sorts of websites is search engine optimization, not the dissemination of legitimate news.  The sites publish whatever they receive – typically for a fee.

38.     Within the past year, no fewer than 8 "fake news" articles have been posted about Plaintiffs.

39.     On March 22, 2025, Defendant published or caused to be published an article titled "Voyeur Twin Deven Sanon Violates In-Law[.][11]"  The article identifies Deven by his full name and provides the name of his alma mater, his twin brother, and his hometown.  It further states that he "commits perverse criminal act of voyeurism" and, more specifically, that:

> In August 2021, as his married twin was asleep, Deven Sanon took his twin's phone, hacked into the device, and violated the private chat and media exchanged between Ronick Sanon and his wife.
> The private chat between the couple – engaged in a long. distance relationship at the time – primarily consisted of sexually intimate and vulnerable conversations.
>
> Deven Sanon rifled through the intimate exchanges between the married couple, proceeding to lecherously take photos of the private

---

[11] https://techbullion.com/voyeur-twin-deven-sanon-violates-in-law/, published March 22, 2025

9

communications and transfer confidential media exchanges between the couple onto his own phone.

In an act of perverted pleasure, Deven Sanon then further disseminated the photos of his married brother and sister-in-law's chat and their shared personal media with his transgender partner, Simran Hotchandani Sanon.

Deven Sanon and Simran Hotchandani Sanon derived illegal kink-related pleasure from the gross invasion of privacy of the married couple.

A newly married couple at the time, Deven Sanon and Simran Hotchandani Sanon created a particularly unsafe family dynamic for Ronick Sanon and his wife through their act of perverted intrusion.

The intrusive nature of the act, Ronick Sanon and his wife's nonconsent to Deven Sanon and Simran Hotchandani Sanon's violation of their right to a personal and private family life, constitute a criminal misdemeanor in the eyes of the law.

Non-consensual dissemination of private and intimate communications and media is a criminal offense under the Penal Code of the State of New York. According to a source close to the family, Deven Sanon is queer by sexual orientation and his 'taboo and sleazy sexual preferences' have always been an additional cause for turmoil in an already turbulent family.  [This paragraph is repeated four times]

The Sanon and Hotchandani families have been prosecuted and await prosecution for numerous criminal activities.

'This doesn't surprise me in the least given that he married his transgender Belizean bride last year after a series of sexually deviant encounters of a perverted nature in his university life – Deven has always been sexually disturbed,' comments a McGill University alumni who graduated with Deven Sanon.

'Simran Hotchandani Sanon – a fraudulent McGill alum – is a transgender woman who actively shares and participates in Deven Sanon's perverted preferences.  Not even sparing their own family members, they both cross all limits of human decency as it relates to their respective sexualities.'

Pending conviction, the Sanon family has refused to comment.

40.    The allegations contained in this article are unequivocally false.  Deven never hacked into his brother's phone, never disseminated any intimate content for illicit purposes, and

neither plaintiff committed a "criminal misdemeanor" under any interpretation of relevant laws. Moreover, Simran is not "transgender" and Deven is not "queer by sexual orientation[.]" The Sanon and Hotchandani families have not been prosecuted and are not awaiting prosecution for numerous criminal activities; there is no pending conviction for any member of the Sanon family.

41.     Defendant has no reason to make any of the above claims and is only doing so because she believes it will cause Plaintiffs reputational, emotional, and financial harm.

42.     On or about June 26, 2025, Defendant published or caused to be published a "fake news" article on TheInscriberMag.com entitled "Transgender Bride's Copycat Trousseau[.]"[12]" The article provided that: "In June 2023, Simran Hotchandani Sanon, a black-Indian, transgender bride from Belize, married Deven Sanon in a wedding that became the subject of everything but marriage." The article then proceeded to make an issue about Simran wearing a dress that resembled a dress that Chatterjee had worn to an event the year before. The article continued that "[g]iven the strained relationship between the two [women], this raised questions about Simran's intentional choice" and that "Simran had long harbored feelings and behaviors of both jealousy and insecurity toward her sister-in-law. It further provided that a family member had informed the source that "'Simran is an embarrassment to the family, Deven is only marrying her to give her a green card in exchange for some economic gain from her family. Ronnie's wife embodies qualities Simran cannot match in this lifetime – personality, beauty, wealth, education, and professional success."

43.     The bizarre article then provides that such tension is "not unusual, especially among transgender women who struggle with comparisons to their cisgender counterparts" and that it was not the first time that Simran had worn a dress in a similar color to one Chatterjee had worn. The

---

[12] https://theinscribermag.com/transgender-brides-copycat-trousseau/, published on June 26, 2025

article further states that Simran is "openly abusive to" Chatterjee and yet has a "fixation on her sister-in-law's image – a desperate attempt to embody the same qualities of her envy.'"

44.    While portions of the article are less than defamatory, including fabricated claims about outfit-related squabbles, these portions convey to the reader a closeness to the involved parties, leading the reader to believe that the author or source has firsthand knowledge of the facts, lending credibility to Defendant's wholly false other claims.

45.    Simran is not a "black-Indian transgender" person; she is in a legitimate relationship with her husband; and her family is not paying his family in exchange for her green card.  Simran was never abusive to Chatterjee and any attempt to create a scandal about the color of clothing she chooses to wear is just a tragic attempt to generate salacious online content where it would not otherwise exist.

46.    Again, Defendant has no reason to believe any of the above claims and is only making them or causing them to be made to make her former family unhappy.

47.    On May 14, 2025, Defendant published or caused to be published another "fake news" article on TheInscriberMag.com, this one entitled "Transgender Bride Married in Tenerife[13][.]"

48.    Once again, Simran was pictured and labeled "black-Indian transgender woman, Simran Hotchandani Sanon."  The article provided that:

> In June of 2023, Premini Events planned and executed the wedding of transgender bride, Simran Hotchandani – now known as Simran Hotchandani Sanon.
>
> Simran Hotchandani Sanon is a black-Indian, transgender woman.

---

[13] https://theinscribermag.com/transgender-bride-married-in-tenerife/?share=print&nb=1, published on May 14, 2025

Belizean citizen, Simran Hotchandani Sanon was born into a conservative and large Indian Sindhi family that defied social norms in embracing Simran Hotchandani Sanon's identity as a trans-woman.

Her husband and US citizen, Deven Sanon, who identifies as bisexual, married Simran Hotchandani Sanon, his transgender bride, in a ceremony of pride conducted in Tenerife, Spain.

Both bisexual Deven Sanon and transgender Simran Hotchandani Sanon wore pink to represent their LGBTQIA community with pride.

After her recent gender-reassignment surgery, which reportedly included a breast augmentation, transgender bride Simran Hotchandani Sanon chose to put her new assets on proud display without a frontal cover dupatta (or veil) as is the norm for Indian brides from respectable families.

Tenerife, known to European natives as a budget and otherwise trashy Magaluf destination, has never been more relevant. The coming together of this LGBTQIA couple is a new milestone for modern Indian history.

Simran Hotchandani Sanon's remarkable journey from a transgender black-Indian woman to a transgender black-Indian bride is the right step in the right direction for conservative Indian society.

Rumor has it that Simran Hotchandani-Sanon's recent gender-change operation has been a success and that could very well be a pregnancy bump we see barely contained in her Falguni Shane Peacock catalog lehenga!

We can neither confirm nor deny but kudos to Simran Hotchandani Sanon's journey ahead as a black-Indian, now-married, transgender woman.

49.    Simran is not a black-Indian transgender woman. Neither she nor her husband are bi-sexual. She did not recently – or ever – have gender reassignment surgery. Defendant has no basis to believe any of the statements she made or caused to be made about Plaintiffs.

50.    On June 9, 2025, Defendant, worried that Deven was taking steps to minimize his harm from her hateful campaign, Chatterjee published or caused to be published an article on TechBullion.com entitled "Deven Sanon: When Self-Promotion Replaces Substance[.][14]"

---

[14] techbullion.com/deven-sanon-when-self-promotion-replaces-substance/, published on June 9, 2025

51.    The article provided that Deven was "spending a considerable amount of effort trying to present himself" as a public figure "[f]ollowing reports of his crimes and increased scrutiny[.]"  The article further stated that Deven was "flooding the internet with self-written, self-flattering articles on obscure, low-rank websites that few take seriously" to "project success and legitimacy[.]"  It further linked to other "fake news" articles published or caused to be published by Defendant, including "A Wedding Bought with a Divorce – The Sanon-Hotchandani Scandal" and Voyeur Twin Deven Sanon Violates In-Law" and contains the same picture of Deven, slightly cropped, five times.

52.    Defendant is well aware that all allegations of criminal activity concerning Deven were published or caused to be published by her and her alone.  Defendant is also aware that any content creation undertaken by Deven contains true and legitimate information about him while also having the added benefit of pushing down the "fake news" sites in his search engine results for which Defendant is responsible.

53.    On or about June 10, 2025, Defendant published or caused to be published another article on TechBullion.com entitled "A Wedding Bought with a Divorce – The Sanon-Hotchandani Scandal[.]"[15]"

54.    This "fake news" article, like the others, identified Deven by naming his parents, twin, hometown, and including his picture.  It further provided that Deven and his brother "are the central figures in a documented case of marital fraud, coercion, illegal eviction, and sustained abuse against a legal wife."

---

[15] techbullion.com/a-wedding-bought-with-a-divorce-the-sanon-hotchandani-scandal/, published June 10, 2025

55.    On or about June 24, 2025, Defendant published or caused to be published an article entitled[16] "Spread the Joy: Belizean Crime Syndicate Masquerading as Charity in North America" on TheInscriberMag.com.   The article started with a large image of Simran and stated that the organization was "controlled almost entirely by members of the Sanon family" and "serves as a front for a sprawling criminal enterprise orchestrated by individuals with dubious ties to Belizean crime syndicates."   The article maligned Simran by portraying her as the head of an elaborate criminal enterprise, providing:

> At the eye of this storm is Simran Sanon (alias Simran Hotchandani Sanon among many others), a near-30-year-old with a chronically underwhelming résumé, including a 2.4 GPA from an easy business degree at McGill University. Despite this glaring lack of qualifications or any legitimate career path, she has been fraudulently employed by this family-run nonprofit to produce mediocre AI-generated marketing content. This employment is illegal: Simran holds no authorization to work in the United States and is being paid off the books – further compounding her violations of immigration law.
>
> **A Trail of Fraud and Deception**
> Simran's criminal activities are not confined to her current role. A deeper dive into her history reveals a consistent pattern of fraud and manipulation stretching across multiple countries and jurisdictions:
> •    Insurance Fraud in Belize: Simran orchestrated multiple false claims of theft and robbery at her family's souvenir shops in Belize, deliberately fabricating losses to claim insurance payouts, a crime that has drawn the scrutiny of Belizean investigators.
> •    Visa and Employment Violations in Canada: While enrolled at McGill University on a student visa, Simran covertly accepted employment with a Canadian tech firm, violating the terms of her visa and depriving lawful Canadian workers of job opportunities.
> •    Education Fraud: During her studies, she misrepresented her Canadian residency status to qualify for reduced tuition fees reserved for citizens, undermining university policies and defrauding educational institutions.
> •    Customs and Smuggling Offenses: Utilizing her family's diplomatic connections, Simran facilitated the smuggling of goods across Belizean borders, evading customs duties and engaging in bribery of officials –

---

[16] https://theinscribermag.com/spread-the-joy-belizean-crime-syndicate-masquerading-as-charity-in-north-america/, published June 24, 2025

activities that compound the criminal enterprise operating under the charity's guise.

- Immigration Marriage Fraud: Simran's sham marriage to Deven Sanon, a dual Canadian-American citizen, has been instrumental in enabling her illegal status in the United States. This marriage is widely understood to be a fraudulent arrangement orchestrated to secure her residency rights.

Deven Sanon, along with his family, has actively facilitated the broader criminal operation, exchanging legal protections and enabling activities in return for "black money" funneled from the Hotchandani family's Belizean network.

**The Family-Run Front and Belizean Connections**
But Simran is far from an isolated case of deception. The entire Spread the Joy operation is a family affair – an incestuous network of relatives who have weaponized their nonprofit's tax-exempt status to funnel millions of dollars into private coffers. The organization cloaks itself in the respectable guise of charitable work, while internally funneling through Belizean shell companies controlled by family-linked criminals. Belize's notoriously lax financial oversight and history as a haven for money laundering make it the perfect staging ground for this cross-border scheme.

Investigations have uncovered that Spread the Joy disguises over 65% of its funding as "administrative expenses," which in reality include inflated salaries, fabricated consulting fees, and sham reimbursements – all paid exclusively to family members. The nonprofit's governance is a farce: no independent directors, no conflict-of-interest policies, and no external audits. It is a textbook case of private inurement and regulatory evasion.

Belizean criminal elements linked to the Hotchandani family operate a series of charities and business fronts throughout North America, using these entities to launder money, evade taxes, and facilitate a wide range of illicit activity – all shielded by familial loyalty and offshore anonymity.

**Federal Crackdown Underway**
Federal authorities are not standing idle. The U.S. Immigration and Customs Enforcement (ICE) agency has been formally informed of Simran's illegal employment, immigration violations, and fraudulent marriage. ICE is currently conducting extensive audits and workplace investigations related to Spread the Joy and its family-run affiliates. Multiple arrests are underway, targeting key family members involved in immigration fraud, tax evasion, and money laundering. This enforcement effort is being coordinated with the IRS Criminal Investigation division and Homeland Security Investigations to dismantle the entire operation.

Legal and tax experts call this an egregious abuse of the nonprofit system, underscoring how Spread the Joy has become nothing more than a conduit for criminal enrichment masquerading as charity. "This is not simply a matter of poor governance or bad actors," said one insider. "It's a deliberate, multi-jurisdictional crime syndicate exploiting legal loopholes and charitable goodwill."

Until federal authorities fully dismantle this family-run enterprise, it will continue to exploit New Jersey's unregulated zones, Belize's financial secrecy, and the charity system itself – undermining public trust and defrauding donors under the false banner of generosity.

56.    Spread the Joy is not owned by Simran or anyone in the Sanon family. Simran has not engaged in insurance fraud by orchestrating fake robbery claims and her family does not own souvenir shops; she has not engaged in visa or employment violations; she has not engaged in education fraud; she has not facilitated cross-country goods smuggling or bribed officials; she does not have a sham marriage. The Spread the Joy Foundation is not funneling millions of dollars from "family-linked criminals" into private coffers and is not laundering money. Simran does not and has never controlled the financials at the organization, which employs a bookkeeper. No such investigation has occurred with relation to Spread the Joy's funding or administrative expenses. Neither Simran nor her family members operate money laundering fronts. Simran was not illegally employed by a company in Canada as her student permit allowed her to work up to twenty hours per week. She has never been illegally employed in the United States either. While Defendant *may* have "formally informed" ICE of her bogus claims, no such audits or investigations are taking place and no arrests are underway. Simran did not receive a business degree from McGill University, and her GPA was not a 2.4. Spread the Joy is a legitimate 501(c)(3) organization and any claims that Simran is a money laundering mastermind are unfounded and outrageous stories created out of thin air.

57.     The entire article is a hit piece built on a sliver of truth – that Simran is involved with Spread the Joy – then defiled with one falsity on top of another.

58.     On February 3, 2025 on BigNewsNetwork.com[17] and again on June 26, 2025, on USAWire.com[18] Defendant published or caused to be published identical articles entitled "McGill University Case Sparks Debate on Academic Integrity[.]".

59.     The articles begin with an image of Simran and her sister-in-law and then provide that "McGill University is at the centre of a significant scandal after Simran Hotchandani Sanon and Serena Sanon were proven to have committed fraud by misrepresenting their residency status to secure tuition fees reserved for Canadian citizens."  They continue with claims that the sister in laws' "fraudulent actions have sparked widespread outrage[.]"

60.     Notably and most obviously, Serena Sanon has never attended McGill University. Additionally, Simran attended McGill University as an international student and paid international tuition for the entirety of her time at the school.

61.     The articles further contained a quote from McGill University officials which Defendant would later submit to Plaintiffs confirming Defendant's responsibility for e-mailing McGill University:

> In response to the scandal, McGill University's Provost and Vice-Principal (Academic), Christopher Manfredi, condemned the individuals involved, saying, "These fraudulent actions are completely unacceptable and go against the very principles upon which McGill University stands. We take these matters extremely seriously, and are committed to maintaining the highest standards of academic integrity." Manfredi also confirmed that the university would be reviewing its admissions procedures to tighten verification processes and prevent future incidents.

---

[17] https://www.bignewsnetwork.com/news/275015517/mcgill-university-fraud-case-sparks-debate-on-academic-integrity
[18] https://usawire.com/mcgill-university-fraud-case-sparks-debate-on-academic-integrity/, June 26, 2025

62.     Simran and her sister-in-law did not commit residency fraud or misrepresent their residency status.  The only person to allege such a thing has been Defendant.  There has been no investigation into Simran's residency and nothing has been "proven" with regard to any such fraud.  Simran was an international student who paid international student tuition.  Again, one of the "individuals involved" – Deven's sister – was never a student at McGill University.

**Defendant's Campaign to Inflict Emotional Distress**

63.     Defendant has engaged in other underhanded activity to cause Plaintiffs and their families emotional distress.

64.     Upon learning the name of Plaintiffs' wedding planner, for instance, Defendant Chatterjee, posing as "AngelaWedsRyan" on Instagram, contacted Plaintiffs' wedding planner to claim that she "was told by our acquaintance and I think your ex client, Simran Hotchandani, that [wedding planner] is 'self-absorbed, fame-hungry and money-minded' – I normally don't go by third party reviews but the wedding is too important to risk.  Just thought I should inform you, we don't know Simran too well but obviously what she's saying to other couples looking to book with you is damaging to your business."

65.     Plaintiff Simran had never said such things about her wedding planner and does not know "AngelaWedsRyan[.]"

66.     Upon information and belief, the account was attempting to induce Plaintiffs' wedding planner to cut ties with Plaintiffs prior to their wedding to interfere with the event and inflict emotional distress on Plaintiffs.

67.     Upon information and belief, "AngelaWedsRyan" was Defendant or someone acting on Defendant's behalf.

68.    Shortly before Plaintiffs' wedding, Plaintiff Deven's mother received a package from Slovakia filled with feces.  The package was accompanied by a note which stated, "Congrats on the wedding!"

69.    Upon information and belief, the package was sent or caused to be sent by Defendant Chatterjee.

70.    On or about August 5, 2023, Deven's employer received an anonymous e-mail from an individual purporting to be a shareholder at the company.  The e-mail urged them to terminate Deven:

**From:** Soma Chatterjee <somachatterjee0266@gmail.com>
**Sent:** Saturday, August 5, 2023 9:16 PM
**To:** Info <info@████████.com>
**Subject:** Re: Employee Deven Sanon

Hi,

It is extremely concerning to me as one of your corporate clients as well as an investor that Deven Sanon is an employee at ███████████. The following post by Deven Sanon's own maternal grandfather, Darshan Suri, is circulating across Facebook and it is extremely concerning and disturbing that such an abusive and disreputed individual would be employed at ██████████████:



I would love some answers and explanations as to why this individual is still employed by ██████████ ████████. Thank you.

Regards,
Soma

71.    Upon information and belief, while the e-mail was sent from an account in Defendant Chatterjee's mother's name, the e-mail was sent by Defendant Chatterjee.

72.    Defendant, who is an attorney, has also taken to republishing the "fake news" articles by e-mail, Facebook, X, Instagram, and, upon information and belief, by way of text message, other social media sites, and other forms of communication.

73.    Defendant disseminated the defamatory statements to recipients located in New York, including New York-based social media groups, New York-focused online communities, and accounts expressly directed at New York audiences.

74.    To say that Defendant has plastered Facebook with her "fake news" articles would be accurate.  Defendant has used Facebook's option to post content anonymously to repost her articles with various conclusions and claims on well over one hundred Facebook groups throughout the country (Exhibit 1).

75.    Chatterjee has created at least one X account (in her former grandfather-in-law's name) to make false claims about Plaintiffs, including "IMMIGRATION, TAXATION, ABUSE CRIMES STORY IN ROCHESTER, NY CRIME BY:…SIMRAN HOTCHANDANI, DEVEN SANON…"  The impersonation account further concluded that the list of family members, which listed Plaintiffs, were "all criminals abusing the immigration, taxation, financial systems of justice in the US" and called upon strangers to "help bring these criminal abusers to justice."

76.    The X account further claimed that Defendant:

> had to deal with this other daughter-in-law Simran Hotchandani who was and is friends with her husband's ex girlfriend, and would jealously and territorially mistreat her during family occasions by making ageist insults, pulling people away while she was speaking to them, informing her husband's ex girlfriend of every happening in their lives, trying to turn the family against her with lies behind her back, teaming up with Manish Sanon to oust her from the family with further lies and deceit, desperately trying to make herself look like the victim while manipulating every person she

could turn them against our friend, making up all kinds of lies to paint our friend in a bad light to the increasingly gullible and material magpies that are the Sanons of the world. Typical and very fresh off the boat Indian girl behaviour that is tacky, cheap, and classless on every level as it contrasts with our friend's education and upbring. She had to deal with her brother-in-law Deven Sanon's increased manipulation by his fresh off the boat, scheming wife, Simran Hotchandani, by virtue of which he told her not to attend family functions and events. This was supported by the rest of the family – the mother and father did not say a word to oppose the mistreatment of their other daughter-in-law in allowing for her exclusion from family functions and events for the sake of Simran Hotchandani's jealousy and insecurity – with cause – of a far better prospect in the same family.

77.    Defendant further tagged Joe Biden, Kamala Harris, USCIS, Kathy Hochul, and various Rochester and Monroe County officials on the impersonation account.

78.    Defendant's statements and online activity repeatedly invoked New York-specific criminal, regulatory, and governmental narratives, including by tagging New York officials, and creating and posting on accounts designed to attract New York audiences, further directing her speech into New York and amplifying her statements' foreseeable impact within the state.

79.    Defendant additionally posted her "fake news" articles to her "CrimeAlertNY" Instagram page, including her story about "Belizean Crime Syndicate Masquerading as Charity in North America" and other articles about Simran's family being criminals and Simran committing academic fraud.

80.    Defendant created approximately fifteen different Instagram accounts which she used in a similar manner and also created a Facebook account to harass and defame Plaintiffs.

81.    Defendant further created the following "fake news" articles all of which take on the same tone of the defamatory content listed above but are by no means identical:

- A Wedding For the Price of A Divorce[19], USAWire.com, August 23, 2024;

---

[19] https://usawire.com/a-wedding-for-the-price-of-a-divorce/

- Academic Failure to Fiverr Faud: Simran Hotchandani Sanon[20], Think7figures.com, undated;
- Monsters-in-Law of Monroe, CoinPRWire.com, August 21, 2024;
- Manish Sanon's Merciless Assault on his Elderly Father-in-Law[21], KJNewsWire.com, undated;
- Married to a Narcissist[22], DisruptInsider.com, undated;
- Micky Suri Elder Abuses Darshan Suri, Rochester, NY[23], TheWashingtonMagazine.com, June 21, 2024;
- EVICTED: Man Who Evicted His Pregnant Wife[24], Think7Figures.com, undated;
- Micky Suri: Family Court Frankenstein[25], DisruptInsider.com, undated;
- Monsters-In-Law of Monroe[26], DisruptInsider.com, undated;
- Simran Hotchandani Sanon's Boujee on a Budget Sindhi Wedding[27], RefinePost.com, March 31, 2024;
- The Criminal Hotchandani Family of Belize[28], TheWashingtonMagazine.com, June 21, 2024; and
- Ronick Sanon, Fund Analyst, Dupes Post-Nuptial Agreement and Abandons Pregnant Wife[29], USAWire.com, undated.

82.    In addition to her "fake news" empire, Defendant created or caused to be created various petitions calling for the revocation of Simran's degree due to residency fraud, including:

- Revoke Degrees for McGill Fraud by Simran Hotchandani Sanon & Serena Sanon[30] on Change.org; and
- Petition Demands Degree Revocation in McGill University Fraud[31] on Fundly.com.

83.    Defendant further created a website entitled BelizeCrime.com on which she posted ten pages of regurgitated claims about Plaintiffs and their families and another website entitled CriminalAbusers.com on which she uploaded images of Plaintiffs and their families, where they

---

[20] https://think7figures.com/academic-failure-to-fiverr-fraud-simran-hotchandani-sanon/
[21] https://www.kjnewswire.com/18996/manish-sanon's-merciless-assault-his-elderly-father-law
[22] https://disruptinsider.com/articles/married-to-a-narcissist/
[23] https://thewashingtonmagazine.com/micky-suri-elder-abuses-darshan-suri-rochester-ny/
[24] https://think7figures.com/evicted-man-who-evicted-his-pregnant-wife/
[25] https://disruptinsider.com/articles/micky-suri-family-court-frankenstein/
[26] https://disruptinsider.com/articles/monsters-in-law-of-monroe/
[27] https://refinepost.com/article/simran-hotchandani-sanons-boujee-on-a-budget-sindhi-wedding/
[28] https://thewashingtonmagazine.com/the-criminal-hotchandani-family-of-belize/
[29] https://usawire.com/ronick-sanon-fund-analyst-dupes-post-nuptial-agreement-and-abandons-pregnant-wife-2/amp/
[30] https://www.change.org/p/revoke-degrees-for-mcgill-fraud-by-simran-hotchandani-sanon-serena-sanon?source
[31] https://fundly.com/m2/petition-demands-degree-revocation-in-mcgill-university-frau

lived, and/or where they worked and continued her claims of criminal "IRS Tax Evasion and Tax Fraud; USCIS Immigration Fraud; IRCC Immigration Fraud; USA Customs Fraud; Canada Customs Fraud; Belize Customs Fraud; Embezzlement[.]"

84.    Defendant has paid and/or caused someone else to pay to promote this content online, including on Instagram.

85.    Upon information and belief, one such market which Defendant targeted was Belize.

86.    As a result, many individuals known by Simran were shown advertisements to Defendant's "fake news" articles which often included Plaintiffs' names, faces, and/or other information about them.

87.    Yet another strategy undertaken by Defendant was to post or cause a third party to post about Plaintiffs on LinkedIn.

88.    In one such post, posing as "Dev J. Shah" a Senior Portfolio Manager at Citadel, Defendant took on the identity of a "father of a daughter whose well-being I am committed to safeguarding" who was posting about his own independent investigations into Plaintiff Simran and her sister-in-law's "admissions fraud[.]"

89.    After an introduction about being a concerned father and providing a link to one of Defendant's "fake news" articles, the post stated the following about Plaintiffs:

> I note that defamation involves false statements, and I thereby maintain that publishing factual information – the truth – is a social responsibility and does not constitute defamation.
>
> I have no personal connection to the victim or her family.  My concern lies with the mistreatment of women, particularly by professionals in my industry. Our profession does not license anyone to exploit or abuse young women.

> After thorough review – including consultation with professional networks, law enforcement, and higher management at McGill University – I also confirm the admissions fraud committed by Simran Hotchandani Sanon and Serena Sanon, and the article's accuracy…
>
> The Sanon family, including Deven Sanon, not only supported but continues to justify these actions.  Such conduct is abusive and indefensible.
>
> Needless to say that discarding your own wife like she's everyday trash reflects poorly on a man's character.  A man fails profoundly – in every way – when he allows his family or friends to mistreat his wife.
>
> These actions are particularly concerning given their professions in industries such as finance and pharmaceuticals, where trust and integrity are paramount.  Ronick's unethical behavior and financial dishonesty constitute a serious breach of professional and ethical standards.
>
> I firmly believe that industries should dissociate from individuals like Ronick Sanon and Deven Sanon.  Endorsing abuse and affiliating with those who abuse women is where we must draw the line.  Misogynistic behavior has no place in any context, and individuals who commit such cruelty must be held accountable…

90.    Predictably, Defendant or someone acting on her behalf then repeatedly shared the above LinkedIn post using multiple accounts with additional narrative.

91.    For instance, "Charles Caldwell" shared the post, adding that the "unfortunate situation highlighted below…underscores the #abuse that still exists in the world, in this case at the hands of twin brothers Ronick Sanon and Deven Sanon" calling upon third parties to "challenge abuse and work towards fostering respect for women" and providing a link to one of Defendant's "fake news" articles.

92.    Posts identical to the one made by "Charles Caldwell" were also made by "Kanji Fatima Wone," "Runa Akter," and "Winston A Ruby" who, upon information and belief, were also Defendant or someone acting on her behalf.

93.     The post was also shared by "Muhammad Faizan" and "Zoffta Recruitment" who also made identical comments above it, stating: "Despite advances, we still face deep-rooted challenges with abuse[.]"

94.     Defendant specifically made these posts in groups in which she knew or suspected Plaintiffs to be a part in order to maximize the likelihood that her falsities would be read by Plaintiffs and those who knew them professionally.

95.     Again, no admissions fraud occurred – not with regard to Plaintiff Simran who paid international student tuition and certainly not with regard to her sister-in-law, who never even attended McGill University.  This fake individual posing as a concerned father certainly did not conduct any research and has no basis to make the claims he is making, including those relating to the alleged abuse and exploitation of Defendant.

96.     For those familiar with Defendant's manufactured tales of her divorce and plight, the post is very clearly written by her.  To others unaware of this fact, however, the post raises concerning information about Plaintiffs and calls upon third parties to cut ties with Plaintiffs professionally.

97.     By posting these claims on LinkedIn, it is evident Defendant hoped it would be viewed by individuals involved with Plaintiffs in a professional setting.

98.     Defendant's goal is evident: to cause Plaintiffs annoyance, harm, reputational damage, emotional distress, and generally disrupt their lives.

**Plaintiffs Identify Defendant as Culprit**

99.     On August 28, 2025, Plaintiffs initiated a Petition for Pre-Action Discovery seeking to conclusively identity the individual or individuals responsible for relentlessly harassing them online.

100.    Specifically, the Petition sought information from Meta Platforms, Inc., Namecheap, Inc., and Change.org.  Once certain companies responded, additional subpoenas were sent to various other online companies and internet providers.

101.    Defendant's name and other identifying information has appeared attached to these harassment accounts.

102.    For instance, while Defendant provided the name of an uninvolved family member when she purchased the URLs for her websites, www.CriminalAbusers.com and www.BelizeCrime.com Defendant provided an e-mail address of tater9838@gmail.com and paid for the website URLs using a PayPal account.  Namecheap further indicated that the email address associated with the relevant PayPal account was legaldues@icloud.com.

103.    The legaldues@icloud.com PayPal account is linked to several banking institutions some of which are active and some of which are inactive and became linked with the account between October 29, 2023 and October 1, 2025.  The name on each account is Srijani Chatterjee.

104.    Beyond the identifying bank accounts, individual payments made by Defendant demonstrate her control over the account.  For example, the notes associated with a transaction for $2,065 on October 1, 2025, provides "Srijani Chatterjee – Deposit for 214 Atlantic Ave Flat 2B minus Allison rent for October[.]"

105.    Another payment made on September 15, 2024 is marked "For Sumer from Srijani" – notably, the payment was directed to "Impester Media" a premium digital marketing agency. Various other payments to "Impester Media" – some of which are marked as being from "Srijani" appear throughout Defendant's PayPal records and total in the thousands of dollars.

106.    Impester Media's website boasts about their ability to have press releases featured on "reputable" news sites for maximum exposure in audiences worldwide.

107.    Online, Impester Media's founder is open about his founding and acquisition of many brands, providing in his biography: "Vedang Shahane is Indian Entrepreneur. He is founder of Impester Media, an Internet firm. He has co-founded and acquired various brands like Impester Media Marketing, Influencer UK, Entrepreneur Card, Universal Music Magazine, Indian Daily…"

108.    At least one article concerning Plaintiffs was published on Influencer UK[32].  The article indicates it has been viewed on more than 616,000 occasions.

109.    The records further indicate Defendant has made payments to Meta Platforms, Inc. for advertisements, premium matchmaking service, a lawyer who represented her in her divorce from Ronick Sanon, a prepaid wireless phone service, an article writing service, and various freelance writers[33].

110.    Upon information and belief, the payments to Meta Platforms, Inc. for advertisements represent payments Chatterjee made to promote the defamatory content she was creating concerning Plaintiffs and their families.

111.    Further, Defendant's PayPal records show her transactions with Change.org in which she pays to promote the petition entitled "Revoke Degrees for McGill University Scammers: Simran Hotchandani Sanon & Serena Sanon[.]"

**Harm to Plaintiffs**

112.    As a direct result of Defendant's conduct, Plaintiffs suffered reputational and professional harm in New York, where they lived, worked, and maintained professional and community relationships at the time the defamatory statements were published and disseminated.

---

[32] https://web.archive.org/web/20241104152334/https://influencermagazine.uk/2023/11/transsexual-bride-simran-hotchandani-sanon-married-in-tenerife/
[33] Relevant payments to such individuals are noted as "Freelance Services[]" "Article Writers[,]" "Victoria O. Williamson[,]" and "Theresa C. Wall[.]"

113.    Plaintiffs have been severely damaged by Defendant's conduct.

114.    As Deven recently founded a biotech company, his online reputation is more important to him than ever before.

115.    Multiple prospective investors have asked Deven directly about materials they have seen online and at least one investor has run an additional background check on him, solely due to Defendant Chatterjee's online posts.

116.    Deven is also aware of other prospective investors asking close colleagues of his about the online posts. While Deven has successfully raised impressive amounts for his startup, Defendant Chatterjee's actions have caused severe reputational harm to Deven's professional endeavors and have, upon information and belief, lost him other potential investments in his startup.

117.    More so, one of Deven's the existing investors in Deven's startup recommended that Deven retain a reputation management company to regain control of his online reputation.

118.    Deven spent approximately $25,000 on the search engine optimization company tasked with the unenviable goal of minimizing and/or deleting Defendant's harassing content and maximizing positive or neutral results about Plaintiff Deven.

119.    Ultimately, much of Chatterjee's content remained online and Chatterjee only used Deven's retention of such a company to generate additional online content, claiming he was attempting to hide evidence of his criminality.

120.    Deven has also been asked about the websites and "fake news" articles by several of his employees during the hiring process and, upon information and belief, multiple potential employees declined to accept positions at Deven's startup due to Chatterjee's online content about Deven and his family.

121.    A mentor from a previous job asked Simran about Chatterjee's online content – as have other co-workers and former co-workers – many of whom indicated that they had seen postings on LinkedIn and/or elsewhere online.

122.    Plaintiff Simran stopped updating her LinkedIn profile shortly after the online harassment began, fearing it would be weaponized as content in the future.  Eventually, she also began deactivating social media accounts, hopeful it would discourage harassment on those platforms.

123.    Unaware of Simran's employer, Defendant began attacking a 501(c)(3) at which Simran was volunteering, claiming that the non-profit was a money laundering front for Simran and her family.

124.    Simran, who no longer volunteers for the organization, has been asked by multiple recruiters about the various websites and "fake news" articles in her name.  In many instances, Simran did not receive offers for positions for which she was well qualified.

125.    Simran has every reason to believe the reason she did not receive offers from these companies is because they were deterred by the "fake news" articles and either believed the allegations contained therein or did not wish to become intertwined in Defendant's harassment as Spread the Joy had.

126.    Simran has further received numerous messages from individuals she knows in Belize who were shown Defendant's advertisements on Instagram.

127.    Similarly, other hateful material was specifically created to target Plaintiffs and their families in Deven's hometown of Pittsford, New York, with one article entitled "Monsters-In-Law of Monroe" (the New York county in which Pittsford is located); another claiming to be a press release sent from "Rochester Media Inc. in Rochester, USA" (the nearest city to Pittsford);

and almost every article mentioning that Deven and his brother are from Pittsford, New York and/or that they have ties to New York.

128.    Simran is now in therapy and has spoken with her therapist extensively about the harassment she has endured and how it has impacted her life and even marriage.

129.    Both Simran and Deven's relationships with Chatterjee's ex-husband also suffered as they both, at times, found it difficult not to blame him for bringing Chatterjee into their lives.

130.    Simran had also applied to multiple law schools but abandoned her applications for fear that a search of her name would prevent her from gaining admission and due to concern that it would cause potential references – individuals she respected – to search her online and change their opinion of her.

131.    Simran now has Google Alerts set up for her name as well as the names of other involved family members so she can be made aware when Chatterjee is renewing her efforts.

132.    Plaintiffs have devoted dozens if not hundreds of hours to searching the internet for Defendant's various internet postings, notifying the websites about the falsity of her articles, and advocating for removal of the content.

133.    In some instances, the websites have cooperated with requests for the removal of Defendant's false content.  In limited instances, they have additionally provided Plaintiffs with context about how the postings were made, including by providing relevant e-mail addresses and/or indicating that the postings were "paid article[s] sent by some PR company[.]"

134.    When Plaintiffs began to have success in having the articles removed, however, Defendant or someone acting on her behalf warned Plaintiffs to stop and began doubling down on their posts and articles.

135.    Realizing the futility of attempting to undo the actions of someone with an insatiable appetite for harassment, Plaintiffs found attorneys.

136.    Defendant's conduct has changed Plaintiffs' view of the internet from one where memories and achievements are viewable to one where fake information about them outweighs legitimate information.

137.    Finally, Defendant's hacking of Deven's grandfather's WhatsApp caused Plaintiffs and Plaintiffs' family members to grow estranged from the older man, who suffered from dementia, for the last months of his life.  Deven will never get that time with his grandfather back.

## FIRST CAUSE OF ACTION
### (Defamation)

138.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

139.    Information provided by third parties, unequivocally demonstrate that Defendant disseminated or caused to be disseminated information about Plaintiffs which is false and defamatory and not the subject of any privilege.

140.    The allegations Defendant made about Plaintiff were widely published and viewable by many third parties as they appeared and, in many instances, still appear online. Defendant further went to great lengths to republish her "fake news" articles on social media, posting them on more than one hundred public Facebook groups.

141.    Defendant had actual knowledge that the information she published, or caused to be published, about Plaintiffs were false and knew or should have known that the information published about Plaintiffs was false and defamatory.

142.    Defendant acted with knowledge of the falsity of these statements and the implications therefrom, reckless disregard for the truth, and/or with malicious intent, both

32

presumed and actual, in knowingly disseminating and/or causing to be disseminated the statements.

143.    The statements made by Defendant were of and concerning Plaintiffs and defame and otherwise impugn Plaintiffs' character, integrity, professionalism, and reputation.

144.    Defendant knew the statements being made were false when she made them and/or made them with reckless disregard for their falsity and/or acted negligently in failing to ascertain the falsity of the statements before communicating them.

145.    Defendant's statements were serious, descriptive, precise and readily understood, and were presented clearly as fact, not opinion, and were designed and sent with the intent of causing third parties to believe the allegations and act upon them in a manner that would cause Plaintiffs harm.

146.    Defendant Chatterjee swore to her then-soon-to-be ex-husband that she would burn his family to the ground and her actions, summarized above, have demonstrated her eagerness and ability to follow through on that threat.

147.    The statements were made with the intent to harm Plaintiffs and with actual malice.

148.    The Defendant's unlawful conduct has caused and will continue to cause Plaintiffs imminent, irreparable injuries for which there are no adequate legal remedies.  Accordingly, Plaintiffs are entitled to permanent injunctive relief.

149.    Because Defendant has placed Plaintiffs' personal character and reputation publicly at issue, Plaintiffs are entitled to a declaratory judgment that Defendant's statements are false.

150.    As a consequence of the Defendant's conduct, Plaintiffs' reputations have been injured, and the Plaintiffs have suffered economic loss.

151.    That by reason of the foregoing, Plaintiffs have been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter.

## SECOND CAUSE OF ACTION
### (Defamation Per Se)

152.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

153.    Defendant's statements charge Plaintiffs with serious crimes and ethical violations; disparage them in their profession, trade, and/or business; and allege sexual misconduct.  Such allegations are libelous per se.

154.    The statements are libelous per se, so that general damages may be presumed as a matter of law.

155.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered quantifiable economic damages including lost contracts, lost prospective business opportunities, costs of mitigation, and out-of-pocket expenses, as well as non-economic damages to reputation and standing. Defendants' conduct was willful and malicious, entitling Plaintiffs to punitive damages.

156.    Defendant's statements were made with the intent to harm Plaintiffs and with actual malice.

157.    That by reason of the foregoing, Plaintiffs have been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter.

## THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

134.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

135.    Defendant engaged in the intentional, extreme, and outrageous conduct of creating a collection of false and outrageous "fake news" articles relating to Plaintiffs, creating petitions to raise awareness for their falsities, messaging Plaintiff Simran's alma mater furthering her falsities, and creating multiple websites to further disparage Plaintiffs and their entire families with wholly fabricated claims.

136.    Defendant's extreme and outrageous conduct was not limited to speech or publication, but included non-expressive acts, including impersonation of third parties, interference with Plaintiffs' professional relationships, workplace harassment directed at employers and associates, and shipment of feces to a family member's residence, all undertaken with the intent to intimidate, humiliate, and inflict severe emotional distress.

137.    While Plaintiffs have reason to believe that Chatterjee recruited freelance writers to create and potentially publish some of the content, some content conclusively traces back to Chatterjee, including the widespread republishing of the "fake news" articles on Facebook and the websites.

138.    As stated above, Defendant Chatterjee has relentlessly published these claims – all while knowing them to be false – for years.

139.    Defendant has undertaken this scheme knowing it could cause irreversible, lifelong consequences for Plaintiffs and their careers, reputations, and mental well-being.

140.    Defendant's conduct was so extreme in degree and so outrageous in character that it goes beyond all possible bounds of decency.

141.    Defendant's sole purpose in engaging in the conduct was to harass and/or embarrass Plaintiffs and retaliate against them for their perceived role in her ex-husband divorcing her.

142.    Defendant intended to cause severe emotional distress or recklessly disregarded the likelihood that such conduct would tend to cause severe emotional distress. Such outrageous behavior is beyond the limits of decency and is intolerable in a civilized society.

143.    As a direct and proximate result of Defendant's conduct, Plaintiffs suffered severe emotional distress.

144.    Defendant acted with the intent to cause severe emotional distress, or alternatively, disregarded the substantial probability that their actions would cause severe emotional distress.

145.    Here, the acts of Defendant were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that their actions would harm Plaintiffs' reputation and mental well-being, that, in addition to all the damages inflicted upon Plaintiffs and in addition to all the measure of relief to which Plaintiffs may properly be entitled herein, Defendant should also be required to pay punitive damages to punish her for her reckless conduct in the further amount greater than the jurisdictional limit of all lower courts to be determined by the trier of fact, in order to deter them and others similarly situated from engaging in such conduct in the future.

146.    Plaintiffs demand judgment against Defendant in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiffs for their severe injuries as well as an amount sufficient to punish Defendant for her willful, wanton, reckless, and unlawful conduct constituting a complete and reckless disregard for Plaintiffs, together with interest, attorneys' fees, costs, and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## FOURTH CAUSE OF ACTION
## (Aiding and Abetting Defamation)

147.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

148.    Records received from PayPal demonstrate that Defendant has paid multiple freelance writers – John Does 1-10 and Jane Does 1-10 – to create some or all of the relevant content.

149.    The information John Does 1-10 and Jane Does 1-10 wrote and/or posted and disseminated on the internet about Plaintiffs is false and defamatory, not the subject of any privilege, and is viewable by many third parties.

150.    These freelancers, John Does 1-10 and Jane Does 1-10, had actual knowledge that the information they were writing and publishing about Plaintiffs was false and knew or should have known the information was false and defamatory.

151.    John Does 1-10 and Jane Does 1-10 acted with knowledge of the falsity of these statements and the implications therefrom, reckless disregard for the truth, and/or with malicious intent, both presumed and actual, in knowingly writing, publishing, posting, and widely disseminating such false statements to third parties.

152.    Chatterjee solicited, encouraged, paid for, employed, and aided and abetted the freelancers – her agents – to write and publish the content.

153.    Plaintiffs suffered damages by Chatterjee's aiding and abetting of the freelancers' defamatory actions.

154.    As a result of Defendants' actions, Plaintiffs demand judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive

damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Intentional Infliction of Emotional Distress)

155.    Plaintiffs repeat and reallege the allegations state above as if fully set forth herein.

156.    John Does 1-10 and Jane Does 1-10 wrote and published content online and created a self-supporting web of online content which multiplies whenever Defendant makes additional payments.

157.    John Doe 1-10 and Jane Doe 1-10's sole purpose of creating the false websites and "fake news" articles is to harass and/or embarrass Plaintiffs and publish for the whole world to see falsities about Plaintiffs.

158.    John Doe 1-10 and Jane Doe 1-10's actions are extreme and outrageous.

159.    Chatterjee is aiding and abetting in John Doe 1-10 and Jane Doe 1-10's extreme and outrageous conduct by directing them to place the content online, funding the campaign of harassment, and helping in the creation of the content.

160.    As a result of Chatterjee's actions, Plaintiffs have been damaged.

161.    As a result of Chatterjee's actions, Plaintiffs demand judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract/Prospective Economic Advantage)

162.     Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

163.     Plaintiff Deven is a biotechnology professional.   At the time the bulk of the statements were made, Plaintiff Simran was a volunteer at Spread the Joy, a 501(c)(3) organization.

164.     With full knowledge of their respective positions, Chatterjee has created multiple articles and websites naming them and their professions – including by naming their employers – with the purpose of alerting Plaintiffs' employers and clients to her false claims and cause them to terminate their relationships with Plaintiffs for fear of further involvement and reputational harm.

165.     During her campaign of harassment against Plaintiff, Defendant engaged in numerous wrongful means, including criminal harassment, misrepresentation, and economic pressure that exceeded simple persuasion.

166.     Defendant's goal was to negatively impact Plaintiffs' careers and overall trajectory at work.

167.     Upon information and belief, Defendant's harassment campaign has negatively impacted Plaintiffs' careers and has caused them to miss out on career opportunities as well as prospective financial incentives at work which they otherwise would have received if not for Defendant's bad acts.

## SEVENTH CAUSE OF ACTION
### (NY Civil Rights Law § 79-n – Bias-Motivated Harassment and Intimidation)

168.     Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

169.     Defendant engaged in a course of conduct constituting harassment and intimidation against Plaintiffs because of Defendant's bias against Plaintiffs' perceived sexual orientation, gender identity, ethnicity, nationality, and marital status, within the meaning of New York Civil Rights Law § 79-n.

170.    Defendant's conduct , impersonation, targeted publication of false criminal accusations, interference with Plaintiffs' employment and professional opportunities, doxxing, and repeated acts designed to instill fear, humiliation, and reputational harm.

171.    Defendant's conduct toward Plaintiffs is classified as harassment under section 240.25 of the penal law, as she was engaging in a course of conduct or repeatedly committing acts which place such person in reasonable fear of physical injury.

172.    Defendant acted with the intent to harass, intimidate, and retaliate against Plaintiffs because of protected characteristics and associations, and did so through a sustained and coordinated campaign extending across multiple platforms and jurisdictions.

173.    As a direct and proximate result of Defendant's violations of Civil Rights Law § 79-n, Plaintiffs have suffered emotional distress, reputational injury, economic loss, and ongoing fear of continued harassment.

174.    Plaintiffs are entitled to injunctive relief, compensatory damages, punitive damages, attorneys' fees, and costs as provided by Civil Rights Law § 79-n (3) and (4).

## EIGHTH CAUSE OF ACTION
### (Civil Conspiracy to Commit Defamation and Intentional Infliction of Emotional Distress)

175.    Plaintiffs repeat and reallege the allegations stated above as if fully set forth herein.

176.    Defendant Chatterjee entered into an agreement with John Does 1-10 and Jane Does 1-10 to create, publish, and disseminate false and defamatory content about Plaintiffs.

177.    The agreement was formed no later than early 2024, when Defendant began making payments to freelance writers and digital marketing agencies, including Impester Media, to create the fake news articles and websites identified herein.

178.    Records obtained from PayPal demonstrate that Defendant made payments totaling thousands of dollars to Impester Media and other freelance content creators between 2024 and 2025.

179.    On September 15, 2024, Defendant made a payment to Impester Media marked "For Sumer from Srijani," demonstrating her direct involvement in commissioning the defamatory content.

180.    Defendant made additional payments to Impester Media throughout 2024 and 2025, each corresponding to the publication of additional "fake news" articles about Plaintiffs.

181.    Defendant further made payments to article writing services and individual freelance writers, as reflected in her PayPal transaction history.

182.    The agreement between Defendant and the freelance writers included the following terms:

    a.    Defendant would provide false information about Plaintiffs, including fabricated claims of criminal conduct, sexual misconduct, immigration fraud, and academic fraud;

    b.    The freelancers would write articles incorporating Defendant's false claims and publish them on content farm websites designed to maximize search engine visibility;

    c.    Defendant would pay the freelancers for their services; and

    d.    The freelancers would publish the content under pseudonyms or anonymously to conceal Defendant's involvement.

183.    In furtherance of this agreement, Defendant and her co-conspirators committed the following overt acts:

41

184.    Created and published no fewer than eight "fake news" articles on websites including TheInscriberMag.com, TechBullion.com, BigNewsNetwork.com, USAWire.com, RefinePost.com, TheWashingtonMagazine.com, Think7Figures.com, DisruptInsider.com, CoinPRWire.com, and KJNewsWire.com;

    a.    Created and published two websites, BelizeCrime.com and CriminalAbusers.com, dedicated to defaming Plaintiffs and their families;

    b.    Created and published online petitions on Change.org and Fundly.com calling for the revocation of Simran's degree based on fabricated claims of residency fraud;

    c.    Paid Impester Media and other digital marketing services to promote the defamatory content online, including through targeted advertisements on Instagram and Facebook;

    d.    Republished the defamatory articles on more than one hundred Facebook groups throughout the United States; and

    e.    Created social media accounts, including an X (formerly Twitter) account impersonating Deven's grandfather, to further disseminate the defamatory content.

185.    Defendant and her co-conspirators intentionally participated in the furtherance of this plan with full knowledge that the statements being published were false and defamatory.

186.    The freelance writers knew or should have known that the information provided by Defendant was false, as the articles contained outlandish and unsupported allegations of criminal conduct, sexual deviance, and fraud that no reasonable person would believe without verification.

187.    Defendant's motivation for entering into this conspiracy was to retaliate against her ex-husband's family, including Plaintiffs, for her ex-husband's decision to divorce her.

188.    As a direct and proximate result of this civil conspiracy, Plaintiffs have suffered severe damages, including (a) reputational harm and damage to their professional standing; (b) loss of business and investment opportunities; (c) emotional distress, anxiety, and mental anguish; (d) costs incurred for reputation management services; (f) costs incurred for pre-action discovery to identify the conspirators; and (g) interference with their personal and professional relationships.

189.    Defendant's conduct was willful, wanton, and malicious, demonstrating a complete and reckless disregard for Plaintiffs' rights.

190.    As a result of Chatterjee's actions, Plaintiffs demand judgment for any actual damages which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, together with damages for pain and suffering and punitive damages, attorney's fees, costs of this litigation and such other relief as the Court deems equitable and just.

## JURY TRIAL DEMANDED

191.    Plaintiffs further seek narrowly tailored equitable relief, to be imposed only after adjudication on the merits, including relief limited to preventing further harassment, impersonation, doxxing, and the publication or republication of statements adjudicated by this Court to be false and defamatory.  Plaintiffs further seek, to the extent permitted, targeted discovery necessary to identify the scope and coordination of Defendant's unlawful conduct.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against

Defendant, containing the following relief:

A.      Injunctive and equitable relief to the extent permitted by law, including:
        1.  Post-adjudication injunctive and equitable relief, tailored to prevent Defendant
            from engaging in further harassment, impersonation, doxxing, or the publication or
            republication of statements adjudicated in this action to be false and defamatory
        2.  An order requiring Defendant to remove or cause the removal of statements
            adjudicated to be false and defamatory from platforms under her control; and
        3.  Such additional equitable relief as necessary to prevent continued harassment or
            intimidation, consistent with the First Amendment and applicable law;
B.      Compensatory damages in an amount to be determined at jury trial, including damages for
reputational injury, emotional distress, and economic loss;
C.      Punitive damages to the extent permitted by law;
D.      Pre-judgment and post-judgment interest as permitted by law;
E.      Reasonable attorneys' fees and costs to the extent permitted by law, including under New
York Civil Rights Law § 79-n (4), and taxable costs under Fed. R. Civ. P. 54(d); and
F.      Such other and further relief as the Court deems just and proper.

Dated: New York, New York
        February 2, 2026

                                Respectfully submitted,

                                **Veridian Legal P.C.**

                                 _/s/ Daniel Szalkiewicz_____
                                By:     Daniel S. Szalkiewicz, Esq.
                                        Cali P. Madia, Esq.
                                23 West 73rd Street, Suite 102
                                New York, NY 10023
                                Telephone: (212) 706-1007
                                Facsimile: (646) 849-0033
                                daniel@veridianlegal.com
                                *Attorneys for Plaintiffs*

44