UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEVEN SANON and SIMRAN HOTCHANDANI,<br><br>Plaintiffs,<br><br>-against-<br><br>SRIJANI CHATTERJEE, JOHN DOES 1-10, and JANE DOES 1-10,<br><br>Defendants. | Case No.: 1:26-cv-00580-AMD-VMS |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SRIJANI CHATTERJEE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

VERIDIAN LEGAL P.C.

Daniel S. Szalkiewicz, Esq.
Cali P. Madia, Esq.
23 West 73rd Street, Suite 102
New York, NY 10023
(212) 706-1007
daniel@veridianlegal.com
*Attorneys for Plaintiffs*

**Table of Contents**

Table of Authorities .... 4
PRELIMINARY STATEMENT .... 6
STATEMENT OF FACTS .... 7
A. The Parties and Stated Motive .... 7
B. The Enterprise and Its Participants .... 7
C. The Fabricated Sworn Documents and the Fabricated Court Order .... 8
D. The Immigration Fraud and Its Financial Yield .... 9
E. The Other Fronts .... 9
F. The Economic Injuries .... 10
STANDARD OF REVIEW .... 10
POINT I .... 11
THE COURT HAS SUBJECT MATTER JURISDICTION WHICH IT MAY RETAIN EVEN IF THE RICO CLAIM IS DISMISSED. .... 11
A. A Non-Frivolous RICO Claim Establishes Federal Question Jurisdiction Regardless of How It Is Ultimately Resolved. .... 11
B. The Alien-Versus-Alien Diversity Argument Is Irrelevant Because Jurisdiction Rests on a Federal Question. .... 12
C. Dismissal of the RICO Claim Would Not Divest the Court of Supplemental Jurisdiction, and Retention Would Be Appropriate Here. .... 12
POINT II .... 13
*KIM V. KIMM* DOES NOT BAR THIS CLAIM, BECAUSE THIS SCHEME IS NOT MADE OF LITIGATION FILINGS. .... 14
A. *Kim* Held Only That Litigation Activity, Standing Alone, Cannot Be a Predicate Act. .. 14
B. The Ninth Cause of Action's Heading Does Not Control Its Substance. .... 15
POINT III .... 15
THE FAC PLEADS AN ASSOCIATION-IN-FACT ENTERPRISE THAT IS BOTH STRUCTURALLY SUFFICIENT AND DISTINCT FROM DEFENDANT. .... 15
A. *Boyle* Requires Three Structural Features, a "Rim" Not Among Them. .... 15
B. Defendant Is Legally Distinct from the Enterprise She Organized and Financed. .... 16
C. The "Common Fraudulent Purpose" Language Defendant Draws from *First Capital* Is Dicta the Second Circuit Has Disavowed. .... 17
POINT IV .... 17
THE FAC PLEADS BOTH CLOSED-ENDED AND OPEN-ENDED CONTINUITY. .... 17
A. Closed-Ended Continuity Is Pleaded by a Scheme Spanning at Least Two Years. .... 18
B. Open-Ended Continuity Is Pleaded Because the Scheme Has No Endpoint and Is Continuing Now. .... 18
POINT V .... 19
FAC PLEADS COGNIZABLE PREDICATE ACTS WITH PARTICULARITY. .... 19
A. Wire Fraud Is Adequately Pleaded. .... 19
B. Immigration Document Fraud Under 18 U.S.C. § 1546 Is an Enumerated Predicate and Is Pleaded with Specificity. .... 22
C. Obstruction Is Adequately Pleaded, and *Aguilar* Supports Plaintiffs. .... 22
D. Rule 9(b) Is Satisfied, and the Pleading Is Not a Group Pleading. .... 23
POINT VI .... 24
PLAINTIFFS PLEAD INJURY TO BUSINESS/PROPERTY UNDER 18 U.S.C. § 1964(c). .. 24

POINT VII ... 25
THE PLEADED INJURY IS DOMESTIC. ... 25
POINT VIII ... 26
PROXIMATE CAUSE IS PLEADED BECAUSE PLAINTIFFS ARE THE DIRECT AND INTENDED TARGETS OF THE SCHEME. ... 26
POINT IX ... 27
THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANT. ... 27
POINT X ... 28
SECTION 230 DOES NOT IMMUNIZE CREATOR AND FUNDER OF CONTENT. ... 28
POINT XI ... 29
THE STATE-LAW CLAIMS ARE ADEQUATELY PLEADED. ... 29
A. The Defamation Claims Are Timely. ... 29
B. The Intentional Infliction Claim Rests on Conduct Beyond the Publications. ... 29
C. The Tortious Interference Claim Is Not a Repackaged Defamation Claim. ... 30
D. Conspiracy & Aiding-and-Abetting Counts Connect Defendant to Underlying Torts ... 30
E. The Civil Rights Law § 79-n Claim Is Adequately Pleaded. ... 30
F. The Anti-SLAPP Statute Supplies a Fault Standard, Not a Pleading Bar. ... 31
POINT XII ... 31
DISMISSAL WITH PREJUDICE WOULD BE IMPROPER. ... 31
CONCLUSION ... 31

## Table of Authorities

### Cases

*A.M.P. v Benjamin,* 201 AD3d 50, 54 [3d Dept 2021] ..... 29
*Air China, Ltd. v Kopf*, 473 F App'x 45 [2d Cir 2012] ..... 11
*Amaranth LLC v J.P. Morgan Chase & Co*., 71 AD3d 40, 47-48 [1st Dept 2009] ..... 29
*Baisch v Gallina,* 346 F3d 366, 374 [2d Cir 2003] ..... 25
*Bascuñán v Elsaca,* 874 F3d 806, 821 [2d Cir 2017] ..... 24
*Bell v Hood*, 327 US 678, 682 [1946] ..... 11
*Boyle v United States*, 556 US 938, 946 [2009] ..... 15, 16
*Bridge v Phoenix Bond & Indem. Co.,* 553 US 639, 649 [2008] ..... 25
*Carlsbad Tech., Inc. v HIF Bio, Inc.*, 556 US 635, 635 [2009] ..... 13
*Cedric Kushner Promotions, Ltd. v King*, 533 US 158, 160 [2001] ..... 17
*Chloe v Queen Bee of Beverly Hills, LLC,* 616 F3d 158, 163 [2d Cir 2010] ..... 26
*Cleveland v United States*, 531 US 12, 23 [2000] ..... 20
*Cofacredit, S.A. v Windsor Plumbing Supply Co.*, 187 F3d 229, 242 [2d Cir 1999] ..... 18
*Commer. Cleaning Servs. v Colin Serv. Sys.,* 271 F3d 374, 384 [2d Cir 2001] ..... 25
*Dees v Knox*, 2025 LX 256150, at *4 [2d Cir Feb. 13, 2025, No. 24-1574-cv] ..... 15
*DeFalco v Bernas*, 244 F3d 286, 321 [2d Cir 2001] ..... 19
*Empire Merchants, LLC v Reliable Churchill LLLP,* 902 F3d 132 [2d Cir 2018] ..... 26
*Fat Brands Inc. v Ramjeet,* 75 F.4th 118, 123 [2d Cir 2023] ..... 26
*First Capital Asset Mgt. v Satinwood, Inc.,* 385 F3d 159, 174 [2d Cir 2004] ..... 17
*Firth v State*, 98 NY2d 365, 369 [2002] ..... 28
*Force v Facebook, Inc.,* 934 F3d 53, 68 [2d Cir 2019] ..... 27
*Geswaldo v Gottlieb*, 2026 US Dist LEXIS 31674, at *3 [SDNY Feb. 17, 2026] ..... 10
*H. J. Inc. v Northwestern Bell Tel. Co.*, 492 US 229, 241 [1989] ..... 17
*Hemi Group, LLC v City of NY,* 559 US 1, 11 [2010] ..... 26
*Holmes v Sec. Inv. Protection Corp.,* 503 US 258, 261 [1992] ..... 24
*Kelly v United States*, 590 US 391, 402 [2020] ..... 20
*Kim v Kimm*, 884 F3d 98, 104 [2d Cir 2018] ..... 14
*Kolari v NY-Presbyterian Hosp.*, 455 F3d 118, 119 [2d Cir 2006] ..... 13
*Kousisis v United States*, 605 US 114, 124 [2025] ..... 20
*La Liberte v Reid*, 966 F3d 79, 87 [2d Cir 2020] ..... 10
*Med. Marijuana, Inc. v Horn*, 604 US 593, 601 [2025] ..... 23
*Rich v Fox News Network, LLC*, 939 F3d 112, 125 [2d Cir 2019] ..... 28
*Riverwoods Chappaqua Corp. v Mar. Midland Bank, N.A.*, 30 F3d 339, 344 [2d Cir 1994] ..... 17
*RJR Nabisco, Inc. v Eur. Community,* 579 US 325, 346 [2016] ..... 23, 24
*Royal Canin U.S.A., Inc. v Wullschleger*, 604 US 22, 33 [2025] ..... 13
*Satanic Temple, Inc. v Newsweek Digit. LLC*, 177 F.4th 202, 211 [2d Cir 2026] ..... 30

*State Farm Mut. Auto. Ins. Co. v Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 98, n 14 [2d Cir 2024] ..... 15
*Stringer v Kim*, 226 AD3d 607, 608 [1st Dept 2024] ..... 28
*Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 127 (2d Cir. 2020) ..... 12
*United States v Aguilar*, 515 US 593, 599 [1995] ..... 21
*United States v Kelly*, 128 F.4th 387, 410 [2d Cir 2025] ..... 17
*Walden v Fiore,* 571 US 277, 277 [2014] ..... 27
*Williams v Affinion Group, LLC*, 889 F3d 116, 124 [2d Cir 2018] ..... 19, 22
*Yegiazaryan v Smagin,* 599 US 533, 534 [2023] ..... 24

**Statutes**

18 U.S.C. § 1961(1)(B) ..... 20
Rule 15(a)(2) ..... 29

## PRELIMINARY STATEMENT

Defendant Srijani Chatterjee ("Chatterjee" or "Defendant") opens her brief with a telling sentence: "This began as a defamation case and remains one" (Def. Mem. at 6). That is not an argument about the First Amended Complaint ("FAC"); it is a request that the Court read a different pleading than the one plaintiffs Deven Sanon ("Deven") and Simran Hotchandani ("Simran" and, with Deven, "Plaintiffs") filed. Defendant's arguments for dismissal, like her other schemes, misrepresentations, and attempts to defraud, do not go beyond verbosity and are fully unsupported by fact or law.

The FAC alleges a coordinated interstate scheme, sustained for at least two years and continuing today, in which Defendant located, financed, and directed a network of paid participants to destroy a family (FAC ¶¶ 1-8, 274). Defendant retained a digital marketing agency, Impester Media, as well as anonymous freelance writers, and paid them through PayPal (FAC ¶¶ 143, 135-139). Defendant further caused the creation of fabricated articles accusing Plaintiffs of criminal conduct, immigration fraud, academic fraud, insurance fraud, customs smuggling, and sexual deviance to be placed for a fee on content-farm websites that perform no editorial or fact-checking function (FAC ¶¶ 80, 60). She purchased and built or caused to be built dedicated websites – BelizeCrime.com and CriminalAbusers.com – to broadcast some of the material. (FAC ¶¶ 52, 111). She bought advertising from Meta and promoted a Change.org petition (FAC ¶¶ 140-143). Defendant created impersonation accounts, including an X account in the name of Deven Sanon's grandfather and a LinkedIn persona posing as a Citadel senior portfolio manager (FAC ¶¶ 263, 116-121). She involved government offices and courthouses, fabricating a sworn affidavit attributed to a former Indian government official who has denied signing it, who was not in the United States on the purported notarization date, and who is not Defendant's godmother; she submitted that fabrication to United States Citizenship and

Immigration Services ("USCIS") in support of an immigration petition that yielded her work authorization; and she then filed it in this Court and in Bronx County Supreme Court. (FAC ¶¶ 174-183). Defendant also transmitted to a legal news outlet a purported sealing order attributed to a judicial officer of this Court when no such order existed and the case was pending. (FAC ¶ 184-185). Defendant is recreating reality online to add another passport to her collection and she is doing so to the detriment of Plaintiffs.

Defendant's attempt to rebrand her actions goes against the FAC. A fabricated affidavit is not a "litigation filing," and a false sworn statement to USCIS that produces work authorization is not "an immigration petition." Defendant's conduct amounts to federal crimes that Congress made RICO predicates. The conduct Plaintiffs pleaded is what matters.

## STATEMENT OF FACTS

### A. The Parties and Stated Motive

Deven Sanon is domiciled in Massachusetts. (FAC ¶ 20). Simran Hotchandani is a citizen of Belize domiciled in Massachusetts. (FAC ¶ 21). Defendant does not dispute Deven is an American citizen. When the challenged publications began occurring, both Plaintiffs were domiciled and residing in New York, later moving to Massachusetts prior to the filing of this action. (FAC ¶ 22). At the time this lawsuit was filed and served, Defendant was alleged to be a citizen and domiciliary of Brooklyn, New York, where she was served. (FAC ¶¶ 22, 17).

The FAC alleges two motives: retaliation against Defendant's former husband and his family following the divorce, and the improvement or preservation of Defendant's immigration status through a petition under the Violence Against Women Act ("VAWA"). (FAC ¶¶ 2-4, 43).

### B. The Enterprise and Its Participants

The FAC identifies an association in fact consisting of Defendant, Impester Media, freelance writers (John/Jane Does 1-10), and content-farm operators including TechBullion.com

and TheInscriberMag.com. (FAC ¶ 263). Their shared purpose is pleaded: to create, publish, amplify, and monetize false and defamatory online content about Plaintiffs while concealing Defendant's identity as the content's originator and funder. (FAC ¶ 261).

Each participant is alleged to perform a distinct function. Defendant recruited, directed, and paid Impester Media and the freelancers. (FAC ¶ 256). Impester Media and the freelancers created the content and coordinated with the content-farm operators to publish and disseminate it. (FAC ¶¶ 60, 261). The content-farm operators supplied the publication venues. (FAC ¶¶ 272-274). The enterprise's activities pleaded include ghostwriting, purchasing publication placement, social-media amplification and paid advertising, creation of anonymous and impersonation accounts, payment processing, and transmission of fraudulent materials to courts, government agencies, employers, media outlets, and third parties. (FAC ¶ 47, 106, 109, 273, 284).

The agreement was formed no later than early 2024, when Defendant began paying freelance writers and digital-marketing agencies including Impester Media. (FAC ¶¶ 256-257). Defendant supplied false information; the freelancers wrote the articles and placed them on content-farm sites; Defendant paid them; and the freelancers published anonymously or under pseudonyms. (FAC ¶ 194). PayPal records reflect payments to Impester Media, including a September 15, 2024 payment annotated "For Sumer from Srijani." (FAC ¶¶ 135, 142-143).

### C. The Fabricated Sworn Documents and the Fabricated Court Order

Defendant is alleged to have fabricated sworn documents and submitted them to USCIS, the Bronx County Supreme Court, and this Court. (FAC ¶ 174). Among the documents at issue is a purported affidavit of Riva Ganguly Das, filed in this action, which asserted that Defendant was her goddaughter and Plaintiffs and their family members were under investigation by Indian and United States governmental agencies. (FAC ¶ 175-181). Ms. Das has denied knowledge of or involvement in the affidavit, denied the signature, was not in the United States on the

purported notarization date, and is not Defendant's godmother. (*Id.*). Defendant submitted that affidavit to USCIS, filed it in this action and in Bronx County Supreme Court, and used it in seeking to proceed pseudonymously and to obtain protective relief. (*Id.*). She also filed an altered version of her VAWA Affidavit of Abuse bearing a March 30, 2023 signature date but containing allegations about later events. (FAC ¶ 182-183). On April 10, 2026, both the fabricated Das affidavit and the altered VAWA affidavit were filed in this action.

Separately, Defendant provided ALM/Law.com with a purported sealing order attributed to Chief Magistrate Judge Scanlon, representing that this case had concluded, when no such order had issued and the case remained pending (FAC ¶ 184-185).

**D. The Immigration Fraud and Its Financial Yield**

Defendant filed a VAWA petition with USCIS supported by her own false affidavit and by an affidavit purportedly from a government official that the official had not signed. (FAC ¶ 3). The petition yielded a prima facie determination that produced employment authorization and eligibility for public benefits. (FAC ¶ 54). On information and belief, Defendant used that work authorization to obtain employment. (FAC ¶¶ 55-56).

**E. The Other Fronts**

Additionally, an Instagram account, "AngelaWedsRyan," was used to contact Plaintiffs' wedding planner and to falsely attribute insulting comments to Ms. Hotchandani. (FAC ¶¶ 92-95.) Shortly before Plaintiffs' wedding, Mr. Sanon's mother received a package mailed from Slovakia containing feces and a note reading, "Congrats on the wedding!"; on information and belief, Defendant sent it or caused it to be sent. (FAC ¶¶ 96-97.) Mr. Sanon's employer received an anonymous email urging his termination, sent from an account in Defendant's mother's name. (FAC ¶¶ 98-99). Defendant hacked Deven's grandfather's WhatsApp, causing estrangement within the family during the last months of his life. (FAC ¶ 173.) An X account was created in

the grandfather's name to make accusations against Plaintiffs and to tag federal, state, and local officials. (FAC ¶¶ 103-106.) Content was republished through more than 100 Facebook groups, a "CrimeAlertNY" Instagram page, and approximately fifteen Instagram accounts. (FAC ¶¶ 102, 107-108). Paid advertisements were targeted to Belize, where people known to Simran were shown material containing Plaintiffs' names, faces, and information. (FAC ¶¶ 112-114).

### F. The Economic Injuries

Prospective investors raised the online materials with Mr. Sanon directly; at least one conducted an additional background check solely because of Defendant's posts; and the conduct cost him potential startup investments. (FAC ¶¶ 151-156). An existing investor recommended that he retain a reputation-management company, and he spent approximately $25,000 on search-engine-optimization services. (*Id*.). Recruiters asked Ms. Hotchandani about the websites and articles, and in many instances she did not receive positions for which she was qualified. (FAC ¶¶ 157-162). The pleaded injuries include lost business, investor, and client relationships; lost professional partnerships and employment opportunities; diminution in the value of professional reputation; the approximately $25,000 in reputation-management spending; pre-action discovery costs; and monitoring and removal costs. (FAC ¶¶ 301-303).

## STANDARD OF REVIEW

"To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.''" (*Geswaldo v Gottlieb*, 2026 US Dist LEXIS 31674, at *3 [SDNY Feb. 17, 2026]). The plausibility standard is not a probability standard and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." (*La Liberte v Reid*, 966 F3d 79, 87 [2d Cir 2020]).

While Plaintiffs believe they will ultimately prove the facts alleged, the above distinction goes to the heart of Defendant's arguments for dismissal as Defendant repeatedly argues not that the FAC fails to allege a cause of action, but rather that what it alleges is unlikely, false, susceptible of an innocent reading, or contradicted by facts outside the pleading. Those are arguments for summary judgment, not a motion to dismiss.

## POINT I
## THE COURT HAS SUBJECT MATTER JURISDICTION WHICH IT MAY RETAIN EVEN IF THE RICO CLAIM IS DISMISSED.

### A. A Non-Frivolous RICO Claim Establishes Federal Question Jurisdiction Regardless of How It Is Ultimately Resolved.

Defendant conflates the merits with jurisdiction. The Supreme Court settled the distinction eighty years ago: "Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." (*Bell v Hood*, 327 US 678, 682 [1946]). Jurisdiction fails only where the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous." *Id.* at 682-83. Defendant does not, and could not, contend that a RICO claim resting on fabricated federal-court filings, a fraudulent USCIS submission that produced work authorization, and years of paid interstate wire transmissions – all of which Plaintiffs have established through pre-action discovery, third-party productions, and Defendant's own filings – is frivolous.

A RICO claim anchors federal question jurisdiction, and the state-law claims proceed with it. (See *Air China, Ltd. v Kopf*, 473 F App'x 45 [2d Cir 2012]). The Second Circuit Court of Appeals in *Air China* held a challenge to diversity "utterly meritless because federal question

jurisdiction existed with respect to the RICO claim," and concluded that even subsequent dismissal of the RICO claim "did not eviscerate jurisdiction over the state law claims." While federal courts may decline to exercise supplemental jurisdiction over a claim when the district court "has dismissed all claims over which it has original jurisdiction" 28 U.S.C. §1367(c)(3) makes such declination permissive not mandatory.

**B. The Alien-Versus-Alien Diversity Argument Is Irrelevant Because Jurisdiction Rests on a Federal Question.**

Defendant argues that complete diversity never existed because Simran is a Belize citizen and Defendant is a United Kingdom citizen. (Def. Mem. at 9-10, *See Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 127 (2d Cir. 2020). Here, jurisdiction rests on 28 U.S.C. § 1331, not § 1332.

Defendant's related contention that the FAC's Massachusetts-domicile allegations are contradicted by other statements (Def. Mem. at 10) asks the Court to resolve a disputed fact against Plaintiffs on the pleadings. That is not the Rule 12 standard and, in any event, domicile at the commencement of the action and residence during the 2024-2025 publication period are different questions, and the FAC pleads both (FAC ¶¶ 18-27).

**C. Dismissal of the RICO Claim Would Not Divest the Court of Supplemental Jurisdiction, and Retention Would Be Appropriate Here.**

Even if the RICO claim were dismissed under Rule 12(b)(6), the Court would retain statutory supplemental jurisdiction over the state-law claims, and declining it would be a discretionary choice rather than a jurisdictional command. In *Carlsbad Tech*., the Supreme Court confirmed that whether a district court retains jurisdiction over a case in which all federal causes of action get dismissed is entirely within the discretion of the district court judge, stating "upon dismissal of the federal claim, the district court retained its statutory supplemental jurisdiction over the state-law claims. Its decision declining to exercise that statutory authority was not based

on a jurisdictional defect but on its discretionary choice not to hear the claims despite its subject-matter jurisdiction over them.” (*Carlsbad Tech., Inc. v HIF Bio, Inc.*, 556 US 635, 635 [2009]).

Defendant’s reliance on *Royal Canin* is misplaced as the court in *Royal Canin* addressed a plaintiff’s voluntary amendment deleting all federal claims, and the Court took care to distinguish court-ordered dismissal by clarifying that "[w]hen federal claims are dismissed by the district court, as in §1367(c)(3), an appellate court may yet revive them; but that cannot happen when the plaintiff has excised them through a proper amendment." *(Royal Canin U.S.A., Inc. v Wullschleger*, 604 US 22, 33 [2025]).

The discretionary factors are “judicial economy, convenience, fairness, and comity. *(Kolari v NY-Presbyterian Hosp.*, 455 F3d 118, 119 [2d Cir 2006]). Comity supplies no reason to send these claims elsewhere: Defendant’s own conduct in this action, including the filing of documents Plaintiffs allege to be fabricated, is squarely before this Court and no other. Beyond that, judicial economy and convenience heavily favor this case remaining in the Eastern District of New York rather than forcing Plaintiff Simran to break off and litigate her claims in state court while her husband proceeds with this litigation. Given Defendant’s attorney is not admitted to practice in New York State, this would also require Defendant retaining a second attorney to litigate substantially similar claims. Plaintiffs would similarly need to expend additional resources. Further, if this case was bifurcated, yet another judge would need to familiarize themselves with nearly identical facts and issues; discovery, for all intents and purposes, would be duplicated; and it is impossible to ignore the possibility that the courts might reach different conclusions. Allowing Deven to proceed against Defendant in federal court while forcing Simran to pursue her claims in state court would needlessly complicate Plaintiffs case against Defendant.

**POINT II**

## *KIM V. KIMM* DOES NOT BAR THIS CLAIM, BECAUSE THIS SCHEME IS NOT MADE OF LITIGATION FILINGS.

### A. *Kim* Held Only That Litigation Activity, Standing Alone, Cannot Be a Predicate Act.

The plaintiff in *Kim* had prevailed in an earlier suit and then sued the opposing parties under RICO, alleging their preparation and filing of declarations in that single prior lawsuit constituted obstruction, mail fraud, and wire fraud. The Second Circuit affirmed dismissal, holding "allegations of frivolous, fraudulent, or baseless litigation activities – without more – cannot constitute a RICO predicate act." (*Kim v Kimm*, 884 F3d 98, 104 [2d Cir 2018]). The Second Circuit Court of Appeals continued, writing, "[w]e decline to reach the issue of whether all RICO actions based on litigation activity are categorically meritless. We conclude only that where, as here, a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." (*Id.* at 105).

The *Kim* court identified the dividing line by distinguishing *Sykes*, where a debt buyer, a law firm, and a process-serving company bought consumer debt, initiated actions, served process improperly, and filed fraudulent documents to obtain default judgments, explaining, "even though those defendants used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity. In the case at bar, by contrast, the entire alleged scheme involved the creation of fraudulent court documents." (*Id.* at 105).

Almost nothing in this scheme (paying a marketing agency, placing articles, purchasing and creating websites, advertising on Meta, creating social media accounts, submitting a fabricated affidavit to USCIS, sending a fake court order to a news outlet, etc.) is a litigation filing. (FAC ¶¶ 5-8, 143, 46-57, 184).

The Second Circuit recently distinguished *Kim* in a case where the plaintiff did not contend that state-court proceedings were themselves predicate acts "but instead that they help further the RICO violation, which consists of a pattern of racketeering activity under the mail fraud statute through other fraudulent activities alleged in the complaint." *(State Farm Mut. Auto. Ins. Co. v Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 98, n 14 [2d Cir 2024]). *Kim* has been applied to bar claims in cases when plaintiffs concede the alleged racketeering "manifest[ed] within or adjacent to judicial proceedings." (*Dees v Knox*, 2025 LX 256150, 2025 U.S. App. LEXIS 3343, at *4 [2d Cir Feb. 13, 2025, No. 24-1574-cv]). Here, the proceedings occurred in response to the racketeering.

**B. The Ninth Cause of Action's Heading Does Not Control Its Substance.**

Plaintiffs acknowledge the typographical error in their ninth cause of action, which Defendant opposed under the correct section. Defendant was clearly able to identify the cause of action as a violation of 18 U.S.C. § 1962(c) as the body of the section identifies the enterprise and its members, enumerates the predicate acts, pleads pattern and continuity, and seeks recovery under 18 U.S.C. § 1964(c). (FAC ¶¶ 270-303). A caption error is not a pleading defect where the allegations state the claim, and Defendant identifies no prejudice.

## POINT III
## THE FAC PLEADS AN ASSOCIATION-IN-FACT ENTERPRISE THAT IS BOTH STRUCTURALLY SUFFICIENT AND DISTINCT FROM DEFENDANT.

**A. *Boyle* Requires Three Structural Features, a "Rim" Not Among Them.**

The Supreme Court has stated what an association-in-fact enterprise requires: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." (*Boyle v United States*, 556 US 938, 946 [2009]).

Here, the purpose was to create, publish, amplify, and monetize false content about Plaintiffs while concealing Defendant's role as originator and funder. (FAC ¶ 273). The

relationships included Defendant recruiting, directing, and paying Impester Media and the writers; the writers and Impester creating content and coordinating with content-farm operators to publish and disseminate it; and the operators supplying the venues for a fee. (*Id.*) In terms of longevity, the enterprise functioned as a continuing unit for at least two years. (FAC ¶ 276).

Defendant claims each relationship Plaintiffs allege in the ninth cause of action runs from hub to a spoke," and "that is a hub-and-spoke with no rim, and it is not a RICO enterprise." (Def. Mem. at 12, 14). This is unsupported by *Boyle*, in which the Supreme Court held "such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." (*Boyle* at 948). "Members of the group need not have fixed roles; different members may perform different roles at different times." (*Id.*). Nor need the group have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." (*Id.*).

Further, the FAC alleges coordination among non-Defendant participants: Impester Media and freelancers "coordinated with content-farm operators to publish and disseminate" the content. (FAC ¶ 276). It alleges multi-party agreement with roles and that Defendant "retained and coordinated writers, PR agencies, ad distributors, and other individuals." (FAC ¶¶ 261, 142). The FAC describes participants working with one another, not merely alongside one another.

Finally, *Boyle* instructs that an enterprise's existence "is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure" (*Boyle* at 951).

**B. Defendant Is Legally Distinct from the Enterprise She Organized and Financed.**

Defendant argues that because she is pleaded as the enterprise's controlling figure, no enterprise exists apart from her. (Def. Mem. at 12). The Supreme Court has rejected that reasoning with a sole owner and his own corporation, stating a "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different

rights and responsibilities due to its different legal status." (*Cedric Kushner Promotions, Ltd. v King*, 533 US 158, 160 [2001]). RICO therefore "applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner – whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." (*Id.* at 166).

To the extent Defendant relies on *Riverwoods*, that decision "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself." (*Riverwoods Chappaqua Corp. v Mar. Midland Bank, N.A.*, 30 F3d 339, 344 [2d Cir 1994]). Here, Defendant does not have employees, but separate persons and entities with whom she associated.

**C. The "Common Fraudulent Purpose" Language Defendant Draws from *First Capital* Is Dicta the Second Circuit Has Disavowed.**

Defendant invokes *First Capital* for to argue enterprise members "must share a common purpose to engage in a particular fraudulent course of conduct." *(First Capital Asset Mgt. v Satinwood, Inc.,* 385 F3d 159, 174 [2d Cir 2004]). In 2025 the Second Circuit addressed that very sentence and held it non-binding: "That quoted phrase was ancillary to a discussion regarding the nexus requirement between an enterprise and racketeering activity and was merely dicta." (*United States v Kelly*, 128 F.4th 387, 410 [2d Cir 2025]). The court further held that "an association-in-fact enterprise need not have an explicitly fraudulent or illegal common purpose to be cognizable as an enterprise under RICO." (*Id.*). Regardless, the FAC does plead a shared unlawful purpose: to publish false content while concealing its funder (FAC ¶261).

**POINT IV**
**THE FAC PLEADS BOTH CLOSED-ENDED AND OPEN-ENDED CONTINUITY.**

A pattern requires related predicates plus continuity, which "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by

its nature projects into the future with a threat of repetition." (*H. J. Inc. v Northwestern Bell Tel. Co.*, 492 US 229, 241 [1989]).

**A. Closed-Ended Continuity Is Pleaded by a Scheme Spanning at Least Two Years.**

The enterprise is alleged to have functioned as a continuing unit for at least two years, through repeated interstate communications and financial transactions (FAC ¶¶ 276-277). That period satisfies the temporal benchmark Defendant's own authorities describe. Duration, moreover, is not the only measure and, "although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." (*Cofacredit, S.A. v Windsor Plumbing Supply Co.*, 187 F3d 229, 242 [2d Cir 1999]). Each of those factors favors Plaintiffs as the predicate acts are numerous and of four statutory varieties; the participants include a marketing agency, multiple writers and website operators; and the fronts of attack, paid articles, impersonation accounts, immigration fraud, and fabricated court documents, are distinct in method though unified in purpose.

Defendant calls her scheme as one aimed at "a handful of victims," echoing *Cofacredit*'s description of "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims through racketeering activity." (*Id.* at 244). But this was not short-lived.

**B. Open-Ended Continuity Is Pleaded Because the Scheme Has No Endpoint and Is Continuing Now.**

Open-ended continuity requires a threat of continuing criminal activity beyond the period of the predicate acts. The FAC alleges content remains online and that Defendant has continued to create and disseminate new content and to file fabricated documents during this litigation. (FAC ¶ 300). The March 2, 2026 transmission of a nonexistent sealing order to a media outlet and the April 10, 2026 filings, are not historical; they postdate the commencement of this action.

Defendant argues the scheme is "inherently terminable" because it was tied to her immigration petition and the family dispute. (Def. Mem. at 14-15). The inherent-terminability cases involve schemes with a built-in ceiling: an insurance limit reached, an entity with nothing left to steal, a finite set of client files to process. Here, even if Defendant is successful in defrauding the U.S. government, her desire to hurt her ex-husband's family appears to be boundless. Defendant continued after she obtained her prima facie determination, after she obtained and left the HPD position, and after she was sued.

The Second Circuit found open-ended continuity on closely analogous reasoning in *DeFalco*, holding that "the escalating nature of the Bernas defendants' demands...indicated that they had no intention of stopping once they met some immediate goal," so that "the scheme was not 'inherently terminable.'" (*DeFalco v Bernas*, 244 F3d 286, 321 [2d Cir 2001]). Here, Defendant has stated she would rip apart Plaintiff's family and "even that could never be enough…" and "no one is going to stop me from speaking the truth" (FAC 45). *DeFalco* also answers Defendant's victim-count argument, because the defendants there targeted a single family and its two companies, and continuity was nonetheless satisfied.

**POINT V**

**FAC PLEADS COGNIZABLE PREDICATE ACTS WITH PARTICULARITY.**

**A. Wire Fraud Is Adequately Pleaded or, at Minimum, Is Not Necessary to Sustain the RICO Claim.**

The federal wire-fraud statute requires a scheme involving deception in which money or property is an object of the fraud and interstate wires are used to execute or further that scheme. "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." (*Williams v Affinion Group, LLC*, 889 F3d 116, 124 [2d Cir 2018]; *see also Kousisis v United States,* 605 US 114, 124 [2025]). Defendant's argument is that the alleged objectives, harming Plaintiffs' prospective economic interests and

obtaining immigration benefits for herself, are not money or property. (Def. Mem. at 17-18). That argument overstates what follows from the money-or-property requirement and, in any event, does not dispose of the RICO claim.

The FAC alleges substantially more than communications intended merely to injure Plaintiffs' reputations. It alleges an interconnected scheme in which Defendant used interstate and foreign electronic communications to retain and pay writers and digital-marketing entities, purchase publication and advertising services, disseminate fabricated materials, and procure immigration-related advantages through false submissions. (FAC ¶¶ 54-56, 135-143, 289-295.)

Second, in 2025 the Supreme Court held that a "defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." (*Kousisis, surpa.*). The Court also addressed the same argument Defendant makes, that a regulatory objective defeats the property element, holding that where "the fraudster seeks to induce the Government into a transfer of its money or property, that loss is sufficient to sustain a fraud conviction." (*Id.* at 133).

*Cleveland* – which involved false statements made on applications for permits to operate poker machines – held that a state's interest in issuing video-poker licenses was not property because "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate." (*Cleveland v United States*, 531 US 12, 23 [2000]). *Kelly* held that a scheme to reallocate bridge traffic lanes solely to impede access was regulatory, and that a property interest "must play more than some bit part in a scheme: It must be an 'object of the fraud.'" (*Kelly v United States*, 590 US 391, 402 [2020]). Those cases require Plaintiffs to allege a scheme aimed at obtaining traditional money or property; they do not convert every economically harmful deception into wire fraud.

Defendant's assertion that payments to vendors were merely "lawful transactions rather than predicate wires" (Def. Mem. at 17-18) does not resolve the issue. A wire communication or transfer need not itself contain the fraudulent representation; the question is whether it was used in execution or furtherance of an otherwise qualifying scheme to defraud. The FAC alleges repeated interstate and foreign electronic payments and communications used to commission, place, promote, and disseminate the challenged material. (FAC ¶¶ 135-143, 289-295.)

Plaintiffs do not, however, rely on the proposition that reputational injury or interference with prospective economic opportunities, standing alone, constitutes property "obtained" by Defendant within the meaning of § 1343. Nor does the RICO claim depend upon every alleged wire independently qualifying as wire fraud. If the Court concludes that particular alleged wires do not satisfy § 1343's money-or-property requirement, those wires would not constitute wire-fraud predicates; that conclusion would not determine whether the FAC separately pleads a sufficient pattern through other enumerated predicate acts.

Here, the FAC separately pleads repeated acts of immigration-document fraud under 18 USC § 1546 and obstruction of justice under 18 USC § 1503. Both offenses are expressly included in Congress's definition of "racketeering activity" under 18 USC § 1961(1)(B). The FAC identifies the allegedly fabricated Riva Ganguly Das affidavit, the altered VAWA Affidavit of Abuse, their submission to governmental and judicial bodies, and the respects in which those documents were allegedly false. (FAC ¶¶ 174-183, 293-297.) It further alleges direct submission of fabricated materials in pending judicial proceedings. (*Id.*)

Accordingly, even if the Court concludes that some or all of the alleged wires do not independently satisfy § 1343's money-or-property requirement, that conclusion would not require dismissal of the RICO claim. The FAC separately alleges multiple acts indictable under

18 USC §§ 1546 and 1503, each expressly enumerated as racketeering activity under § 1961(1)(B). Those predicates must be evaluated independently, and if adequately pleaded they supply the required predicate acts regardless of whether every asserted wire-fraud theory survives.

### B. Immigration Document Fraud Under 18 U.S.C. § 1546 Is an Enumerated Predicate and Is Pleaded with Specificity.

Section 1546 is listed among the federal offenses that constitute racketeering activity under 18 U.S.C. § 1961(1)(B). Unlike the immigration offenses enumerated in § 1961(1)(F), which require a financial-gain purpose, a § 1961(1)(B) predicate carries no separate financial-gain element. In any event, financial gain is pleaded: the petition produced employment authorization, which produced paid employment. (FAC ¶¶ 54-55).

Defendant argues that the pleading fails to particularize the false statement or the submission (Def. Mem. at 18-19) however, the FAC identifies two specific documents: the fabricated Riva Ganguly Das affidavit, submitted to USCIS in support of the VAWA self-petition, and the VAWA Affidavit of Abuse, submitted to USCIS and later altered and filed in this Court. (FAC ¶ 293). It identifies what made the Das affidavit false, in detail: Ms. Das denied knowledge of it, denied the signature, was not in the United States on the purported notarization date, and is not Defendant's godmother. (FAC ¶¶ 174-179). It identifies what made the VAWA affidavit false: it bears a March 30, 2023 signature date but recites events that occurred later. (FAC ¶ 297.) It identifies the recipient (USCIS), the purpose (the VAWA petition), and the result (a prima facie determination, work authorization, and employment).

### C. Obstruction Is Adequately Pleaded, and *Aguilar* Supports Plaintiffs.

Defendant contends that § 1503 does not reach a litigant's own filings. (Def. Mem. at 19-20). *Aguilar* holds no such thing, instead imposing a nexus requirement, "that the act must have a relationship in time, causation, or logic with the judicial proceedings." (*United States v Aguilar*,

515 US 593, 599 [1995]). The court in *Aguilar* found that requirement unsatisfied where a defendant made false statements to an investigating agent who had not been subpoenaed and might never appear before the grand jury" (*Id.*). The court contrasted that situation with the delivery of false documents to a tribunal, which "all but assures" that the tribunal will consider the material (*Id.* at 601). Defendant's submissions fall into the latter category. Further, transmitting to ALM/Law.com a purported sealing order and representing that a pending case had concluded is not a litigation submission. (FAC ¶ 153).

**D. Rule 9(b) Is Satisfied, and the Pleading Is Not a Group Pleading.**

Rule 9(b) requires that a complaint "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." (*Williams* at 124). The FAC names the publications and the sites on which they appeared (FAC ¶ 109); the payment mechanism, the payee, and a dated payment (FAC ¶ 143); the impersonation accounts and the personas used (FAC ¶¶ 95-127); the fabricated documents, their recipients, their filing dates, and the specific respects in which they are false (FAC ¶¶ 174-183); and the transmission to a named media outlet (FAC ¶¶ 184-185).

Defendant's authorship argument, that payment to a marketing agency is "equally consistent with lawful services" (Def. Mem. at 25), is not a pleading objection. Even taken on its own terms it fails, because the pleading does not rest on payment alone but rather payment plus an alleged agreement with allocated roles – plus registration and operation of dedicated websites bearing Plaintiffs' accusations (FAC ¶ 143), plus impersonation accounts created to amplify the same accusations (FAC ¶¶ 47, 57, 106), plus Defendant's own advance statement of intent to produce "articles, books, [and] interviews" (FAC ¶ 45).

Further, naming Doe writers is not inconsistent with alleging Defendant's authorship and control. The FAC alleges that Defendant supplied the false information and that the freelancers wrote and placed the articles anonymously at her direction and expense. (FAC ¶¶ 238, 273).

**POINT VI**
**PLAINTIFFS PLEAD INJURY TO BUSINESS/PROPERTY UNDER 18 U.S.C. § 1964(c).**

Defendant argues the pleaded injuries are reputational, emotional, speculative, or self-inflicted. (Def. Mem. at 15-17) however, in 2025 the Supreme Court held: "A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more." (*Med. Marijuana, Inc. v Horn*, 604 US 593, 601 [2025]). The court explained the phrase "operates with respect to the kinds of harm for which the plaintiff can recover, not the cause of the harm for which he seeks relief," and illustrated the point with a gas-station owner who cannot recover for pain and suffering after a robbery but can recover for the loss of his business if his injuries force him to close. (*Id.*). Business or property losses are not barred simply because they derive from an antecedent non-economic harm.

Measured against that standard, the pleaded injuries are cognizable and concrete, including approximately $25,000 spent on search-engine-optimization and reputation-management services. (FAC ¶¶ 154). Lost startup investments from identified prospective investors who raised the online materials directly are lost property. (FAC ¶¶ 151-153.) Lost employment opportunities, where recruiters asked about the articles and positions did not follow, are injuries to "business" as the Second Circuit defines it. (FAC ¶¶ 160-161). Lost business, investor, client relationships, and professional partnerships are pleaded as categories of loss.

Defendant's contention that Deven's success in raising some capital defeats the claim (Def. Mem. at 16-17) is a damages argument dressed as a pleading argument. A plaintiff who raises capital despite the scheme may still have raised less, later, or on worse terms.

**POINT VII**
**THE PLEADED INJURY IS DOMESTIC.**

A private RICO plaintiff "must allege and prove a domestic injury to its business or property." (*RJR Nabisco, Inc. v Eur. Community,* 579 US 325, 346 [2016]). The Supreme Court has since rejected any residency-based bright line and held that "determining whether a plaintiff has alleged a domestic injury [for purposes of RICO] is a context-specific inquiry that turns largely on the particular facts alleged in a complaint," and that a plaintiff satisfies § 1964(c) "when the circumstances surrounding the injury indicate it arose in the United States." *(Yegiazaryan v Smagin,* 599 US 533, 534 [2023]).

Every circumstance here points to the United States. Both Plaintiffs are domiciled in Massachusetts. (FAC ¶¶ 20-21.) During the publication period they lived, worked, and maintained professional and community relationships in New York, and the reputational and professional harm occurred there. (FAC ¶¶ 22-27, 55). The investors and recruiters whose decisions produced the economic loss were reached through Plaintiffs' United States professional networks. (FAC ¶ 150-163). The $25,000 in reputation-management spending was incurred in the United States. (*Id.*) The fraudulent submissions went to a United States federal agency and to two United States courts. (FAC ¶¶ 47, 174).

Defendant's reliance on Simran's Belize citizenship and on the foreign location of some actors and servers (Def. Mem. at 20-21) does not change the analysis. *Yegiazaryan* rejected exactly that approach and *RJR Nabisco* confirmed the domestic-injury requirement "does not mean that foreign plaintiffs may not sue under RICO." (*RJR Nabisco* at 353, n 12). Nor does *Bascuñán* assist her; it held that "absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *(Bascuñán v Elsaca,* 874 F3d 806, 821 [2d Cir 2017]).

## POINT VIII
## PROXIMATE CAUSE IS PLEADED BECAUSE PLAINTIFFS ARE THE DIRECT AND INTENDED TARGETS OF THE SCHEME.

RICO requires "some direct relation between the injury asserted and the injurious conduct alleged." (*Holmes v Sec. Inv. Protection Corp.,* 503 US 258, 261 [1992]). Defendant argues that bars any claim where damages materialize through third parties' reactions. (Def. Mem. at 21-22). The Supreme Court has squarely rejected that reading. In *Bridge*, the Court held that a RICO plaintiff need not have relied on the defendant's misrepresentations and offered a hypothetical that describes this case: "suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud." (*Bridge v Phoenix Bond & Indem. Co.,* 553 US 639, 649 [2008]). Proximate cause was satisfied there because the injury was "the direct result" of the fraud, there were no independent factors accounting for it, and no more immediate victim was better situated to sue. (*Id.* at 658).

All three conditions hold here. First, the scheme's stated purpose was to destroy Plaintiffs, and the content was designed and targeted to reach their professional networks and business contacts. Second, no independent factor accounts for an investor who ran an extra background check "solely" because of Defendant's posts. (FAC ¶ 151). Third, there is no more immediate victim other than Plaintiffs and their families.

The Second Circuit has held that "RICO standing extends to all directly injured parties, not just the most directly injured among them," and that "[n]o precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing." *(Baisch v Gallina,* 346 F3d 366, 374 [2d Cir 2003]). It has likewise sustained a claim where a plaintiff "lost profits directly as the result of [the defendant's] underbidding, which it achieved

through its violation of § 1324(a)," even though the fraud was directed at third parties. (*Commer. Cleaning Servs. v Colin Serv. Sys.,* 271 F3d 374, 384 [2d Cir 2001]).

*Hemi* turned on a chain in which "the City's theory of liability rests not just on separate actions, but separate actions carried out by separate parties," where the defendant owed the plaintiff no duty and the State was the direct victim and "defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)". *(Hemi Group, LLC v City of NY,* 559 US 1, 11 [2010]). *Empire Merchants* failed because the plaintiff's harm came from retailers' independent purchasing decisions and because New York State was a better-situated victim. (*Empire Merchants, LLC v Reliable Churchill LLLP,* 902 F3d 132 [2d Cir 2018]). Here, Defendant aimed the scheme at Plaintiffs who lost money.

**POINT IX**
**THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANT.**

At this stage "plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant[,] [and] . . . we construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." (*Chloe v Queen Bee of Beverly Hills, LLC,* 616 F3d 158, 163 [2d Cir 2010]). Here, the FAC alleges that Defendant is a citizen and domiciliary of Brooklyn, New York, and pleads her street address. (FAC ¶¶ 22, 29). Domicile in the forum is the paradigmatic basis for general jurisdiction over an individual. Defendant's brief asks the Court to reject that allegation on the pleadings, which Rule 12 does not permit.

Further, under CPLR 302(a)(2), the tortious acts of co-conspirators committed in New York may be imputed to a non-domiciliary who directed them when a plaintiff alleges a conspiracy involving overt acts in New York, plus the defendant's awareness of the effects in New York, benefit to the defendant from the New York activity, and action by the co-conspirators at the defendant's direction, control, or request. (*Fat Brands Inc. v Ramjeet,* 75

F.4th 118, 123 [2d Cir 2023]). The FAC supplies each element: an agreement with allocated roles, Defendant's direction and payment of the participants, her awareness that Plaintiffs lived and worked in New York and that the harm would land there, and her benefit in the form of the campaign she commissioned and the immigration and employment advantages she obtained (FAC ¶¶ 273, 143, 23-27, 163, 65, 54-55). Additionally, Defendant is alleged to have tagged federal, state, and local officials, to have operated a "CrimeAlertNY" Instagram page, to have directed content at New York audiences and New York-focused communities, and to have filed fabricated documents in New York courts. (FAC ¶¶ 107, 105-106, 174). She also announced that "all of New York City" and "all of New York State" would hear her allegations. (FAC ¶ 45).

*Walden* does not help Defendant as it holds that "the plaintiff cannot be the only link between the defendant and the forum," (*Walden v Fiore,* 571 US 277, 277 [2014]), and it expressly reserved questions about virtual contacts. Here Plaintiffs are not the only link.

Finally, Defendant's invocation of the defamation carve-outs in CPLR 302(a)(2) and (a)(3) has no application to the RICO, fraud, and interference claims.

**POINT X**
**SECTION 230 DOES NOT IMMUNIZE CREATOR AND FUNDER OF CONTENT.**

Section 230(c)(1) protects a defendant from being treated as the publisher of "information provided by another information content provider." It does not protect the content's creator. The statute defines "information content provider" to include "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet."*(Force v Facebook, Inc.,* 934 F3d 53, 68 [2d Cir 2019]). A defendant "is not entitled to immunity because it participated in the development of the deceptive content posted on fake news pages," and that its "role in managing the affiliate network far exceeded that of neutral

assistance." (*FTC v LeadClick Media, LLC*, 838 F3d 158, 176 [2d Cir 2016]). Defendant is the originator, financier, and director of the content: she conceived and directed it.

**POINT XI**
**THE STATE-LAW CLAIMS ARE ADEQUATELY PLEADED.**

**A. The Defamation Claims Are Timely.**

Defendant identifies three articles dated June 21, August 21, and August 23, 2024 as untimely. (Def. Mem. at 26-27). Even accepting her framing as to those three, it disposes of nothing else. The FAC alleges at least eight articles in the year preceding filing and identifies publications across at least ten websites. Under the single-publication rule, each separate article is its own publication with its own accrual date. (*Firth v State*, 98 NY2d 365, 369 [2002]).

*Firth* also preserves the republication exception: "Republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion," where "the subsequent publication is intended to and actually reaches a new audience." *Id.* at 371. Republication requires that the original publisher "participate in or approve of the decision to republish." (*Stringer v Kim*, 226 AD3d 607, 608 [1st Dept 2024]). That is pleaded here: Defendant is alleged to have directed republication through more than 100 Facebook groups and roughly fifteen Instagram accounts, and to have paid to promote the content to new audiences, including audiences in Belize. (FAC ¶¶ 113, 142.) Whether any particular republication reached a new audience with Defendant’s participation is a fact question.

**B. The Intentional Infliction Claim Rests on Conduct Beyond the Publications.**

Defendant argues the IIED claim duplicates the defamation claims. (Def. Mem. at 28). It does not, because it rests on conduct that is not speech about Plaintiffs at all, including mailing a package of feces to Deven’s mother days before the wedding (FAC ¶ 96); impersonating the couple’s wedding planner’s correspondent to sabotage the wedding (FAC ¶¶ 92-95); sending an anonymous email to Deven’s employer urging his termination (FAC ¶¶ 98-99); and hacking the

WhatsApp account of a grandfather with dementia to estrange him from his family in the last months of his life (FAC ¶ 173).

The Second Circuit has held that IIED and defamation "are two distinct torts claims," and that although the outrageousness standard is demanding, "that is not the case when there is a deliberate and malicious campaign of harassment or intimidation." (*Rich v Fox News Network, LLC*, 939 F3d 112, 125 [2d Cir 2019]).

**C. The Tortious Interference Claim Is Not a Repackaged Defamation Claim.**

New York law is explicit that "[d]efamation is a predicate wrongful act for a tortious interference claim," and that where the gravamen is economic injury rather than generalized reputational harm, the interference claim stands on its own. *(Amaranth LLC v J.P. Morgan Chase & Co*., 71 AD3d 40, 47-48 [1st Dept 2009]).

**D. Conspiracy & Aiding-and-Abetting Counts Connect Defendant to Underlying Torts.**

Defendant is correct that New York recognizes no independent tort of civil conspiracy, however, a "plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme," alleging "a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." *(Blanco v Polanco, 116 AD3d 892, 896 [2d Dept 2014])*.

**E. The Civil Rights Law § 79-n Claim Is Adequately Pleaded.**

Section 79-n reaches a person who "intentionally selects a person . . . for harm or . . . causes physical injury . . . to another . . . in whole or in substantial part because of a belief or perception regarding the . . . gender . . . of a person," and a plaintiff must show actual or imminent physical harm resulting from bias-related violence or intimidation. *(A.M.P. v Benjamin,* 201 AD3d 50, 54 [3d Dept 2021]). Defendant claims the FAC is simply a family

vendetta. (Def. Mem. at 30). The FAC, however, specifically alleges targeting Plaintiffs due to their perceived gender or nationality, including claiming Simran is transgender and blanketing Indian Facebook groups with false claims (FAC ¶¶5-8). Whether that conduct satisfies § 79-n's intimidation and harm elements is a question that should be resolved on a developed record.

**F. The Anti-SLAPP Statute Supplies a Fault Standard, Not a Pleading Bar.**

Defendant invokes Civil Rights Law § 76-a to demand clear and convincing proof of actual malice. (Def. Mem. at 29). The Second Circuit has held that § 76-a "is substantive law: It 'governs the rights and obligations' of parties to certain defamation suits by defining the standard of fault required to succeed on such claims," while expressly declining to decide whether New York's procedural anti-SLAPP provisions apply in federal court. (*Satanic Temple, Inc. v Newsweek Digit. LLC*, 177 F.4th 202, 211 [2d Cir 2026]). A substantive standard of proof is not a pleading requirement. Defendant cannot convert an evidentiary burden into a Rule 12 screen. In any event, malice is pleaded, and pleaded concretely as one does not fabricate documents while believing one's accusations to be true.

## POINT XII
## DISMISSAL WITH PREJUDICE WOULD BE IMPROPER.

Defendant asks for dismissal with prejudice on the theory that every defect is legal rather than factual. (Def. Mem. at 30-31.) For the reasons above, there are no defects. But if the Court disagrees as to any count, the appropriate remedy is leave to replead. Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires."

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this court deny Defendant's motion in its entirety.

Dated: September 5, 2026
New York, New York

VERIDIAN LEGAL P.C.

By: ________/Daniel S. Szalkiewicz___________
Daniel S. Szalkiewicz
Cali P. Madia
*Attorneys for Plaintiffs*